[No. B177852. Second Dist., Div. Three. July 25, 2005.]

THE ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES, Petitioner,
v.
SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[No. B180696. Second Dist., Div. Three. July 25, 2005.]

DOE 1, et al., Petitioners, v.
SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

■■■■■■■■■■■■■■■■■■■■■■■■

COUNSEL

Hennigan, Bennett & Dorman, J. Michael Hennigan, Donald F. Woods, Jr., and Jeffrey S. Koenig for Petitioner The Roman Catholic Archbishop of Los Angeles.

Law Offices of Guzin & Steier and Donald H. Steier for Petitioners Doe 1 and Doe 2.

O'Melveny & Myers and Charles C. Lifland for Monsignor Thomas J. Green as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Steve Cooley, District Attorney, Lael Rubin, William Hodgman, Patrick D. Moran and Brentford J. Ferreira, Deputy District Attorneys, for Real Party in Interest.

OPINION

KLEIN, P. J.—

## INTRODUCTION

This proceeding arises out of a grand jury investigation into allegations that two Roman Catholic priests, petitioners Doe 1 and Doe 2 (sometimes hereafter referred to as the Priests), sexually assaulted children while they worked for petitioner Roman Catholic Archbishop of Los Angeles, a Corporation Sole (hereafter referred to as the Archdiocese). In seeking to quash grand jury subpoenas duces tecum, petitioners raise issues that require a balance of the rights of religious belief and practice with the rules of the criminal justice system.

■ As the California Supreme Court noted in connection with this state's evidentiary privilege for clergy-penitent communications (Evid. Code, §§ 1030–1034), "the statutory privilege must be recognized as basically an explicit accommodation by the secular state to strongly held religious tenets of a large segment of its citizenry." (*In re Lifschutz* (1970) 2 Cal.3d 415, 428 [85 Cal.Rptr. 829, 467 P.2d 557].) While it is true the right to religious freedom holds a special place in our history and culture, there also must be an accommodation by religious believers and institutions to the rules of civil society, particularly when the state's compelling interest in protecting children is in question. Although the religion clauses of the First Amendment to

the United States Constitution "embrace[] two concepts,—freedom to believe and freedom to act," the first concept "is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." (*Cantwell v. Connecticut* (1940) 310 U.S. 296, 303–304, fn. omitted [84 L.Ed. 1213, 60 S.Ct. 900].)

The Los Angeles County Grand Jury subpoenaed various documents from the Archdiocese which purportedly would allow the grand jury to determine whether to indict the Priests. Petitioners objected to disclosure of the subpoenaed documents, primarily relying on the freedom of religion clauses in the federal and California Constitutions and on California's evidentiary privileges. Some of petitioners' objections were sustained, but the great majority of them were overruled. Petitioners seek to reverse the adverse rulings. With the exception of a single document, we affirm the rulings ordering the subpoenaed materials to be turned over to the grand jury.

## PROCEDURAL BACKGROUND

In June and July 2002, the Los Angeles County Grand Jury served subpoenas duces tecum on the Archdiocese's custodian of records, seeking documents relating to child sexual abuse allegedly committed by certain Roman Catholic priests. Except for routine attorney-client communications, the Archdiocese turned over the requested documents. However, several priests and the Archdiocese immediately filed motions to quash the subpoenas. As a result, none of the documents has been turned over to the grand jury.

The parties to this proceeding, the petitioners, the Priests and the Archdiocese, and the real party in interest, the District Attorney of Los Angeles County (District Attorney), stipulated to the appointment of Retired Judge Thomas Nuss as referee (hereinafter, referee) to resolve substantive issues raised by the motions to quash.

On July 15, 2002, the referee concluded the subpoenas were not defective for failing to meet the affidavit requirements set forth in Code of Civil Procedure sections 1985, subdivision (b) (affidavit shall be served with subpoena duces tecum showing good cause and materiality) and 1987.5 (service of subpoena duces tecum is invalid without affidavit).

On July 29, 2002, petitioners sought a writ of mandate from this court vacating the referee's order denying their motions to quash. We issued an order to show cause. After briefing and oral argument, we held a California grand jury has the power to issue a subpoena duces tecum and that such a

subpoena does not require a good cause affidavit. (*M. B. v. Superior Court* (2002) 103 Cal.App.4th 1384 [127 Cal.Rptr.2d 454].)[1]

On June 25, 2004, the referee quashed all the grand jury subpoenas in response to the United States Supreme Court's decision in *Stogner v. California* (2003) 539 U.S. 607 [156 L.Ed.2d 544, 123 S.Ct. 2446], which held California's newly enacted statute of limitations for child molestation was unconstitutional when used to *revive* time-barred prosecutions. However, the referee granted the People leave to serve new subpoenas requesting the identical documents on the assurance and subsequent showing the People were investigating credible, prosecutable claims against named targets.

On June 30, 2004, the People served the two grand jury subpoenas, one for Doe 1 and one for Doe 2, at issue in this writ proceeding.

On July 9, 2004, Does 1 and 2 moved to quash the new subpoenas. The Archdiocese followed with its own motion to quash.

On September 7, 2004, the referee issued a decision which substantially rejected petitioners' motions to quash. Out of the approximately 285 subpoenaed documents challenged by petitioners below, the referee sustained 53 objections and ordered the remaining documents turned over to the grand jury. Of the 53 sustained objections, one was based on the attorney-client privilege (Evid. Code, § 954), two were based on the clergy-penitent privilege (Evid. Code, §§ 1033–1034), and 50 were based on the physician-patient privilege (Evid. Code, § 1014). The referee stayed disclosure of the documents to enable the parties to seek review.

Thereafter, the Archdiocese filed a petition for writ of mandate in this court seeking to prevent disclosure of 15 documents the referee had ruled could go to the grand jury. The Priests filed their own petition for writ of mandate asking this court to prevent the disclosure of *any* documents to the grand jury. The petitions were consolidated, an order to show cause was issued, production of documents was stayed, and briefing was obtained from the parties.

An amicus curiae brief from Monsignor Thomas Green, a professor of canon law, was filed in support of petitioners' claims.

## FACTUAL BACKGROUND

1. *Petitioners' claim the subpoenaed documents cannot be disclosed to grand jury.*

Petitioners contend the referee erred in ruling the subpoenaed documents should be disclosed to the grand jury because compliance with the subpoenas

---

[1] We also decided a second writ petition in this matter. (See *Los Angeles Times v. Superior Court* (2003) 114 Cal.App.4th 247 [7 Cal.Rptr.3d 524].)

would violate constitutional and statutory rules. Petitioners assert a Catholic bishop has a religious obligation to care for the physical, emotional and spiritual well-being of the priests within his diocese. Petitioners argue all the communications arising out of this obligation, including communications with the accused priests and the psychotherapists who treat them, are protected from disclosure by the constitutional right to freedom of religion and by California's psychotherapist-patient and clergy-penitent evidentiary privileges. In support of these claims, petitioners submitted evidentiary declarations, which were opposed by declarations filed by the District Attorney.

2. *Petitioners' evidentiary declarations; their reliance on the church's "formation of clergy" doctrine.*

In declarations supporting its motion to quash, the Archdiocese asserted that according to Roman Catholic doctrine, bishops are the direct successors of the 12 apostles of Jesus Christ.[2] Under the church's "formation of clergy" doctrine, a bishop is charged with the responsibility of sanctifying his priests, and is obligated to "care for and treat any emotional, physical, or spiritual problem a priest may be experiencing."[3] In carrying out this obligation, a bishop "may establish detailed boundaries for his priests concerning chastity" and "pass judgment in particular cases concerning the observance of this obligation. The bishop is obliged to intervene and judge inappropriate conduct of any priest and to impose restrictions and penalties as appropriate in his moral judgment." The Archdiocese argued these tasks require "open communications between the bishop and his priests."

A bishop "is permitted to appoint Episcopal vicars. An Episcopal vicar has the same power as a Bishop in the specific type of activity for which he is appointed." The archbishop in Los Angeles, Cardinal Mahony, has appointed such a vicar, called the Vicar for Clergy, who is obligated to care for the "emotional, physical, psychological and spiritual lives" of the archdiocesan priests. Monsignor Craig Cox, who is both a canon lawyer and the Vicar for Clergy, declared Cardinal Mahony had established policies for the Archdiocese under which accusations of clerical sexual misconduct immediately are investigated. "The involved priest is confronted and is encouraged to

---

[2] We express no opinion regarding the validity of any interpretation of religious doctrine contained in these declarations.

[3] This citation comes from the referee's final decision in this matter. Although this, and similar factual statements, originated in declarations filed by the parties in this court, most of those declarations have been filed under seal. Therefore, this opinion will refer to the facts alleged below either by citing the referee's decision, which is not under seal, or by referring generically and circumspectly to documents presently filed under seal. (See *Huffy Corp. v. Superior Court* (2003) 112 Cal.App.4th 97, 105 [4 Cal.Rptr.3d 823]; *In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 308 [116 Cal.Rptr.2d 833].)

discuss whatever problems he is experiencing regarding chastity." "Msgr. Cox states 'Based on the fundamental religious relationship between the bishop and his priest, the priest is encouraged to communicate his deepest psychological and sexual issue[s], to undergo psychiatric evaluation and treatment, and to share the results of this therapy with the Vicar and the Bishop. *All of this for the purpose of the ongoing formation and sanctification of the priest.*' " (Italics added.)

If "a canonical investigation of a boundary violation or accusation of sexual misconduct [is required], the process is conducted in accord with the requirements of Canons 1717–1719"[4] and pursuant to Archdiocesan practice. These Canons require the bishop to inquire carefully either personally or through some acceptable person, about the facts and circumstances and about the imputability of the offense. [¶] . . . [T]o date, the bishops and priests have always understood that these records would be confidential, and files covering these materials would be kept separately from the priest's normal personnel file."

### 3. *The District Attorney's evidentiary declarations.*

In an attempt to rebut petitioners' evidentiary claims, the District Attorney submitted declarations from Thomas Doyle, a Roman Catholic priest who is also an expert in canon law.

Father Doyle stated it is expected the preliminary investigation, required by Canons 1717–1719, will generate a written record. "The information contained in the record may be sensitive and is to be treated accordingly with due regard for the reputations of those involved. It may however, be licitly and properly disclosed to civil law enforcement agencies if it involves [a] matter as serious as sexual abuse." Father Doyle asserted "investigations of child abuse documented by the Archdiocese, through the Vicar for Clergy, which are kept in the 'secret archives' (confidential files) can be and have been supplied to law enforcement in other jurisdictions."

### 4. *Referee's final decision on petitioners' claims.*

In his final decision, the referee rejected petitioners' claims all the subpoenaed documents had arisen out of the archbishop's religious obligation to care for the physical, emotional and spiritual well-being of his priests, and,

---

[4] Canon 1717, section 1, provides, in part: "Whenever an ordinary has knowledge, which at least seems true of a delict, he is carefully to inquire personally about the fact. . . ." "Canon 1719 states in part: '[T]he acts of the investigation, the decrees of the ordinary *which initiated and concluded the investigation*, and everything which preceded the investigation are to be kept in the secret archive of the curia if they are not necessary for the penal process.' "

therefore, that disclosing them to the grand jury would violate a constitutional right to freedom of religion, California's evidentiary privileges for clergy-penitent and psychotherapist-patient communications, and various other rules of law.

The referee held the subpoenas violated neither the free exercise clause nor the establishment clause of the federal Constitution. Further, compliance with the subpoenas would not impermissibly burden petitioners' religious beliefs or practice under *Employment Div., Ore, Dept. of Human Res. v. Smith* (1990) 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595] (*Smith*), nor would it create an impermissible governmental entanglement with internal church affairs under *Lemon v. Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105]. As for California's free exercise clause, even under the pre-*Smith* (*Smith, supra,* 494 U.S. 872), compelling state interest test, disclosure was required because the government has a compelling interest in prosecuting child molesters.

While the referee found evidence in the record to support the assertion Cardinal Mahony had a religious obligation to care for his priests, he also found the Archdiocese simultaneously had been engaged in the kind of routine investigation any employer would undertake upon learning a trusted employee had been accused of child molestation. In addition, the referee held the clergy-penitent privilege was inapplicable where the communication had been disclosed to a third person.

Regarding the principal remaining issues, the referee concluded the psychotherapist-patient privilege protected some of the subpoenaed documents, that the prosecution of Doe 1 and Doe 2 was not precluded by the United States Supreme Court's statute of limitations ruling in *Stogner v. California, supra,* 539 U.S. 607, that the prosecutor had not improperly manipulated the grand jury process, and that the subpoenas were not impermissibly vague or overbroad.

## CONTENTIONS

Petitioners' chief contentions are that disclosure of the subpoenaed documents is barred by the First Amendment of the federal Constitution and by the free exercise clause of the California Constitution, as well as by Evidence Code provisions relating to the clergy-penitent and psychotherapist-patient privileges.

Additionally, petitioners contend disclosure of the subpoenaed documents is barred by California's attorney-client and work product privileges; under *Stogner v. California, supra,* 539 U.S. 607, disclosure of the subpoenaed

documents is barred by the ex post facto clause; the District Attorney improperly usurped the grand jury's authority; the subpoenas duces tecum were impermissibly vague and were issued without proper authority and without the requisite good faith affidavit; and disclosure of the subpoenaed documents is barred by assorted statutory and constitutional rules.

## DISCUSSION

### 1. *Constitutional right to freedom of religion does not bar disclosure of the subpoenaed documents.*

Petitioners contend the disputed documents[5] cannot be turned over to the grand jury without violating their right to freedom of religion. In particular, they claim disclosure of the subpoenaed documents will violate the free exercise and establishment clauses of the First Amendment to the federal Constitution, as well as the free exercise clause of the California Constitution. For the reasons explained, *post*, petitioners' contention is without merit.

#### a. *General principles.*

■ "The Religion Clauses of the First Amendment provide: 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." (*Cutter v. Wilkinson* (2005) 125 S.Ct. 2113, 2120 [161 L.Ed.2d 1020].) The First Amendment "safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." (*Cantwell v. Connecticut, supra,* 310 U.S. 296, 303–304, fn. omitted.)

■ Judicial decisions regarding the religion clauses of the First Amendment are subject to de novo review. (See *Rubin v. City of Burbank* (2002) 101 Cal.App.4th 1194, 1199 [124 Cal.Rptr.2d 867] [establishment clause challenge to religious invocation at municipal function reviewed de novo].)

---

[5] While the Archdiocese is challenging only the disclosure of 15 documents, the Priests are disputing every single document the referee ordered turned over to the grand jury.

b. *No violation of the free exercise clause of the federal Constitution.*

Petitioners' contention that disclosure of the subpoenaed documents would violate the free exercise clause of the federal Constitution is defeated by *Smith.*

(1) Smith's *new rule for evaluating free exercise claims rests on "neutral laws of general applicability."*

In *Smith, supra,* 494 U.S. 872, a case involving peyote use by members of the Native American Church in a state (Oregon) which had not granted an exemption for sacramental use of the drug, the United States Supreme Court adopted a new rule for evaluating free exercise claims. *Smith* rejected the former balancing test (see *Sherbert v. Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790]), under which "governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest," reasoning "We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition." (*Smith, supra,* 494 U.S. at pp. 878–879, 883.) Under the new rule, "the right of free exercise does not relieve an individual of the obligation to comply with a *'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'* [Citation.]" (*Id.* at p. 879, italics added.)

In *Church of the Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 U.S. 520 [124 L.Ed.2d 472, 113 S.Ct. 2217], the United States Supreme Court summed up its newly-announced rule "In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that *a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.* . . . A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." (*Id.* at pp. 531–532, italics added.)

Although *Smith* involved criminal conduct, the case is not limited to such situations. As *Smith* commented, "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, *like its ability to carry out other aspects of public policy,* 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.' [Citation.] To make an individual's obligation to obey such a law

contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling'—permitting him, by virtue of his beliefs, 'to become a law unto himself,' [citation]—contradicts both constitutional tradition and common sense." (*Smith, supra,* 494 U.S. at p. 885, fn. omitted, italics added; see *Gary S. v. Manchester School Dist.* (1st Cir. 2004) 374 F.3d 15, 18 [rejecting argument *Smith* was "limited to instances of socially harmful or criminal conduct," court applied *Smith* to claim the Individuals with Disabilities Education Act was unconstitutional as applied to disabled child attending Catholic elementary school].)

*Smith* is applicable here and defeats petitioners' contention the First Amendment's free exercise clause bars disclosure of the subpoenaed documents.

### (2) *The "ecclesiastical abstention" doctrine does not apply.*

Petitioners, however, argue an exception to the *Smith* rule applies, namely, the ecclesiastical abstention doctrine. This doctrine grew out of the so-called church property cases. However, the church property cases, as exemplified by the ones cited by the Archdiocese, are inapposite because they involve internal church disputes whose resolution crucially depend on interpretations of religious doctrine.[6]

However, the case at bar is not, at its core, an *internal* church dispute. It is a criminal investigation into suspected child molestation allegedly committed by Catholic priests. *Smith* itself characterized the church property decisions as cases in which the government was impermissibly "lend[ing] its power to one or the other side in controversies over religious authority or dogma." (*Smith, supra,* 494 U.S. at p. 877.) The case at bar does not involve an internal church dispute over religious authority or dogma.

### (3) *The "ministerial exception" doctrine does not apply.*

Petitioners also argue the *Smith* rule does not defeat their free exercise claim because the so-called ministerial exception doctrine applies. Petitioners' reliance on this exception is misplaced.

---

[6] The Archdiocese relied on the following church property cases. *Watson v. Jones* (1872) 80 U.S. 679 [20 L.Ed. 666], arose out of a schism in the Presbyterian Church during the Civil War about the morality of slavery, which led to legal disputes between rival congregations over entitlement to church property. *Watson* deferred to a ruling by the church's national governing body. In *Kedroff v. St. Nicholas Cathedral* (1952) 344 U.S. 94 [97 L.Ed. 120, 73 S.Ct. 143], where the right to use church property depended on the validity of a religious official's ecclesiastical appointment, the court deferred to the church's own ruling. *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696 [49 L.Ed.2d. 151, 96 S.Ct. 2372], reversed a decision, reinstating a defrocked bishop, predicated on the lower court's theory the church's internal disciplinary process had been defective.

The ministerial exception doctrine is based on the notion a church's appointment of its clergy, along with such closely related issues as clerical salaries, assignments, working conditions and termination of employment, is an inherently religious function because clergy are such an integral part of a church's functioning as a religious institution. (See, e.g., *Werft v. Desert Southwest Annual Conference* (9th Cir. 2004) 377 F.3d 1099, 1101.) This is not an employment case and the ministerial exception doctrine has no application here.

### (4) Smith *applies to these grand jury subpoenas.*

■ The Archdiocese contends *Smith* is inapplicable because there is no legislative act at issue, and because subpoenas are not neutral laws of general application. This argument misconstrues the notion of generally applicable neutral laws. "A law is not neutral towards religion if its 'object . . . is to infringe upon or restrict practices because of their religious motivation. . . .' [Citation.] A law is not generally applicable if it 'in a selective manner impose[s] burdens only on conduct motivated by religious belief . . . .' " (*Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 550 [10 Cal.Rptr.3d 283, 85 P.3d 67].) The neutral law of general applicability at issue here is the statutory and common law[7] basis of California's grand jury process. That this particular grand jury investigation and the subpoenas it generated are directed at a Catholic archdiocese is merely an incidental effect of the grand jury process.

In *Matter of Grand Jury Subpoena (Chinske)* (D.Mont. 1991) 785 F.Supp. 130, the petitioner claimed that having to comply with a grand jury subpoena would violate his religious beliefs. At oral argument, the petitioner's attorney "attempted to distinguish *Smith* . . . by claiming that the compulsion to testify before the grand jury is not a law of general application prohibiting certain conduct." (*Id.* at p. 133.) Commenting that "[c]ounsel clearly does not appreciate the scope of the Supreme Court's recent rulings concerning free exercise claims," the federal court held "*Smith* clearly does not apply only to cases where the law in question prohibits certain conduct, since the court considered tax collection cases in reaching its decision. [Citation.] The laws of this land compel all persons to pay taxes assessed by various governmental bodies, regardless of their religious convictions, . . . In much the same way, the laws of this land compel all persons to testify before the grand jury when subpoenaed to do so . . . ." (*Id.* at pp. 133–134.) Assuming for the purpose of

---

[7] As this court pointed out in *M. B. v. Superior Court, supra,* 103 Cal.App.4th at pages 1388–1389 "our Supreme Court has emphatically 'rejected the contention that the California grand jury [is] a "purely" statutory body, wholly distinct from its common law predecessor.' (*People v. Superior Court (1973 Grand Jury)* (1975) 13 Cal.3d 430, 440, fn. 11 [119 Cal.Rptr. 193, 531 P.2d 761].)"

decision that the petitioner's religious beliefs were sincere, the court held the free exercise claim was defeated by *Smith* because any burden on petitioner's religious beliefs was not the object of the grand jury subpoena, but " 'merely the incidental effect of a generally applicable and otherwise valid' governmental action." (*Id.* at p. 134.)

We similarly conclude the grand jury subpoenas here do not violate the free exercise clause of the federal Constitution because they are based on a valid and neutral law of general applicability that will have, at most, an incidental effect on the Archdiocese's practice of keeping confidential the communications arising out of the archbishop's formation of clergy obligation of caring for his priests.

### c. *No violation of the establishment clause of the federal Constitution.*

Petitioners contend disclosure of the subpoenaed documents is barred by the establishment clause of the federal Constitution. This claim is without merit because the primary effect of enforcing the subpoenas will not require the government either to interfere with the internal workings of the Archdiocese, or to choose between competing religious doctrines.

■ "The Establishment Clause provides that 'Congress shall make no law respecting an establishment of religion. . . . ' [Citation.] In *Lemon v. Kurtzman*, 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105] (1971), the Supreme Court established a three-part test for determining whether a statute violates the Establishment Clause: [¶] First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion. [Citation.]" (*E.E.O.C. v. Catholic University of America* (D.C. Cir. 1996) 317 U.S. App. D.C. 343 [83 F.3d 455, 465].) "Although it is difficult to attach a precise meaning to the word 'entanglement,' courts have found an unconstitutional entanglement with religion in situations where a 'protracted legal process pit[s] church and state as adversaries,' [citation], and where the Government is placed in a position of choosing among 'competing religious visions.' [Citation.]" (*Ibid.*) "Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, [citation], and we have always tolerated some level of involvement between the two. Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." (*Agostini v. Felton* (1997) 521 U.S. 203, 233 [138 L.Ed.2d 391, 117 S.Ct. 1997].)

The Archdiocese asserts that, under *Lemon*, "[t]he constitutional question can be simply put: Does the state action (here it is a subpoena) interfere with

a religious practice?" The Archdiocese answers this question as follows: "The effect of these subpoenas is to interfere with the bishop's pastoral and episcopal relationship with his priests in need, to destroy any serious pastoral discussion of deeply personal and intimate concerns of the priests regarding their celibacy, sexuality and emotional and psychological needs, and to 'foster an "excessive government entanglement with religion." ' [Citation.] More specifically, these subpoenas interfere directly with ecclesiastical policy by mandating the disclosure of information that, under Roman Catholic practice, is held in strict confidence."

The Archdiocese asserts the closest Supreme Court decision to the case at bar is *NLRB v. Catholic Bishop of Chicago* (1979) 440 U.S. 490 [59 L.Ed.2d 533, 99 S.Ct. 1313], which held the National Labor Relations Board's (NLRB) exercise of jurisdiction over lay teachers at Catholic high schools presented a significant First Amendment risk. However, the core issue in that case was whether there had been unfair labor practices, and it was this issue which was necessarily entangled with questions of religious doctrine.[8]

However, the core issue in the case at bar is whether children were molested by priests who worked for the Archdiocese, an issue having no comparable religious doctrine aspect.

Also pertinent here is *Society of Jesus of New England v. Commonwealth* (2004) 441 Mass. 662 [808 N.E.2d 272], in which the Massachusetts Supreme Judicial Court rejected a claim that disclosure of a priest's personnel file, in connection with a criminal prosecution for sexual assault, would violate the establishment clause. The court explained "With regard to the test of 'effect' on religion, we must look at the law's 'principal or primary effect,' *Lemon v. Kurtzman, supra*, not at its incidental effects. Here, the alleged inhibition on religion is not a 'principal or primary' effect of the subpoena, although it may, in a subtle way, provide some disincentive that would arguably discourage accused priests from being totally forthcoming with their superiors. . . . [¶] *Nor does the enforcement of this subpoena result in any excessive government entanglement with religion.* The court can decide issues of relevance, burdensomeness, and the applicability of the asserted privileges without having to decide matters of religion or embroil itself in the internal workings of the Jesuits. Indeed, the only form of 'entanglement' with religion at issue in the motions to quash is a form that [the priest] and the Jesuits have

---

[8] The case involved "charges of unfair labor practices filed against religious schools," to which "the schools had responded that their challenged actions were mandated by their religious creeds. The resolution of such charges by the [NLRB], in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." (*NLRB v. Catholic Bishop of Chicago, supra,* 440 U.S. at p. 502.)

themselves invited, namely, the court's consideration whether [the priest's] communications qualify for protection under the priest-penitent privilege . . . . Assessment of the applicability of that privilege does not lead to excessive government entanglement in religion." (*Id.* at p. 283, fn. omitted, italics added.)

This case is analogous to *Society of Jesus of New England v. Com., supra,* 808 N.E.2d 272, rather than to *NLRB v. Catholic Bishop of Chicago, supra,* 440 U.S. 490. We conclude disclosure of the subpoenaed documents to the grand jury will not result in excessive entanglement or any other violation of the establishment clause.

### d. *"Hybrid rights" exception to* Smith *not applicable.*

Petitioners contend disclosure of the subpoenaed documents would violate the First Amendment because the so-called hybrid rights exception to the *Smith* rule applies in this case. The Archdiocese argues "the neutrality rule of *Smith* does not apply" here because "the challenged state conduct interferes with the free exercise of religion *and* causes excessive entanglement." This claim is without merit.

As a doctrinal matter, the nature and scope of the so-called hybrid rights exception to *Smith* is rather nebulous. "The *Smith* court developed the hybrid claim exception in an effort to explain several past decisions which invalidated on free exercise grounds laws that appeared to be neutral and generally applicable. [Citation.]" (*Gary S. v. Manchester School Dist.* (D.N.H. 2003) [241 F.Supp.2d 111, 121], fn. omitted, affd. (1st Cir. 2004) 374 F.3d 15, 19.) "The most relevant of the so-called hybrid cases is *Wisconsin v. Yoder,* 406 U.S. 205, 232–33 [32 L.Ed.2d 15, 92 S.Ct. 1526] (1972), in which the Court invalidated a compulsory school attendance law as applied to Amish parents who refused on religious grounds to send their children to school." (*Brown v. Hot, Sexy and Safer Productions, Inc.* (1st Cir. 1995) 68 F.3d 525, 539.) Under the hybrid rights theory, " 'the First Amendment [still] bars application of a neutral, generally applicable law to religiously motivated action' if the law implicates not only 'the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press[.]' [Citation.] In such 'hybrid' cases, the law or action must survive strict scrutiny." (*San Jose Christian College v. Morgan Hill* (9th Cir. 2004) 360 F.3d 1024, 1031.)

However, even assuming a hybrid rights exception to *Smith,* it would not apply to this case because the Archdiocese merely has combined a free exercise claim with a meritless establishment clause claim. (See *Catholic Charities of Sacramento, Inc. v. Superior Court, supra,* 32 Cal.4th at p. 559,

fn. 15 ["Catholic Charities perfunctorily asserts that its claims under the establishment clause [citation] also justify treating this case as involving hybrid rights. We have, however, already determined that those claims lack merit."].) Hence, *Smith*'s "valid and neutral rule of law of general applicability" standard does apply to petitioners' federal free exercise claim.

### e. *California free exercise claim is meritless.*

Petitioners contend the *Smith* rule does not apply to a free exercise claim under the California Constitution and that we should apply, instead, the pre-*Smith* compelling state interest test. However, we conclude that even pursuant to the former strict scrutiny test, under which governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest, disclosure of the subpoenaed documents would not violate petitioners' rights. Therefore, we need not decide whether *Smith* applies to California's free exercise clause.

California's free exercise clause (Cal. Const., art. I, § 4.) provides "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State."

The *Smith* case was decided in 1990. In 2004, the California Supreme Court was faced in *Catholic Charities of Sacramento, Inc. v. Superior Court, supra,* 32 Cal.4th 527 with a claim that the pre-*Smith* test applies to California's free exercise clause because its language differs from the federal free exercise clause.[9] "Catholic Charities' final argument for applying strict scrutiny invokes the free exercise clause of the California Constitution. [Citation.] That clause, Catholic Charities contends, forbids the state to burden the practice of religion, even incidentally, through a neutral, generally applicable law, unless the law in question serves a compelling governmental interest and is narrowly tailored to achieve that interest. Catholic Charities asserts, in other words, that we must interpret the California Constitution the same way the United States Supreme Court interpreted the federal Constitution's free exercise clause in *Sherbert, supra,* 374 U.S. 398." (*Catholic Charities,* at p. 559, fn. omitted.)

Saying that in the proper case it would not have hesitated "to declare the scope and proper interpretation of the California Constitution's free exercise clause," *Catholic Charities of Sacramento, Inc. v. Superior Court, supra,* 32 Cal.4th at page 562 concluded it did not need to do so because the pre-*Smith*

---

[9] Whereas the federal clause prevents Congress from passing any law prohibiting the free exercise of religion, California's free exercise clause guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference . . . ." (Cal. Const., art. I, § 4.)

strict scrutiny test[10] had been met. *Catholic Charities* involved the claim by a religiously-connected nonprofit public benefit corporation that it had been impermissibly burdened by the Women's Contraception Equity Act (WCEA), a law requiring certain health and disability contracts to cover prescription contraceptives. The Supreme Court held "Assuming for the sake of argument the WCEA substantially burdens a religious belief or practice, the law nevertheless serves a compelling state interest and is narrowly tailored to achieve that interest. [¶] The WCEA serves the compelling state interest of eliminating gender discrimination." (*Catholic Charities of Sacramento, Inc. v. Superior Court, supra,* 32 Cal.4th at pp. 563–564.)

We reach a similar conclusion here. As the following case law demonstrates, the grand jury's investigation into suspected child molestation serves a compelling state interest and is narrowly tailored to achieve that interest.

In *Branzburg v. Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646], in the course of holding that reporters may be required to testify before grand juries about the criminal conduct of their confidential sources, the United States Supreme Court said "Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle [is] that *'the public . . . has a right to every man's evidence,'* except for those persons protected by a constitutional, common-law, or statutory privilege . . . ." (*Id.* at p. 688, italics added.) "The requirements of those cases, [citation], which hold that a State's interest must be 'compelling' or 'paramount' to justify even an indirect burden on First Amendment rights, are also met here. As we have indicated, *the investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen,* and it appears to us that calling reporters to give testimony in the manner and for the reasons that other citizens are called 'bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification.' [Citation.]" (*Id.* at p. 700, italics added.)

With a nod to *Branzburg,* many federal cases since have held that compelled testimony before a grand jury in violation of a witness's religion does not constitute a free exercise violation. We rely on federal cases in this context because (1) before *Smith* was decided, both the federal and the California free exercise clauses were analyzed under the compelling state interest test (see *Walker v. Superior Court* (1988) 47 Cal.3d 112, 138–141

---

[10] "Under [the strict scrutiny] standard, a law could not be applied in a manner that substantially burdened a religious belief or practice unless the state showed that the law represented the least restrictive means of achieving a compelling interest or, in other words, was narrowly tailored." (*Catholic Charities of Sacramento, Inc. v. Superior Court, supra,* 32 Cal.4th at p. 562.)

[253 Cal.Rptr. 1, 763 P.2d 852]), and (2) we have found no California cases involving free exercise clause claims in a grand jury context.

These federal cases have assumed, for the purpose of decision, that the witness's objection to testifying was both sincerely held and religiously grounded. Each case concluded the ensuing burden on the witness's religious belief was outweighed by the compelling state interest in obtaining grand jury testimony. (See *In re Grand Jury Empaneling of Special Grand Jury* (3d Cir. 1999) 171 F.3d 826, 832 [even if Orthodox Jewish law proscribed giving grand jury testimony against family member, "the government's interest in securing the evidence" in white collar crime case was "compelling" because "the duty to prosecute persons who commit serious crimes is part and parcel of the government's 'paramount responsibility for the general safety and welfare of all its citizens' "]; *Grand Jury Proceedings of John Doe v. U.S.* (10th Cir. 1988) 842 F.2d 244, 247–248 [Mormon belief proscribing intra-family testimony before grand jury was outweighed by compelling state interest in investigating violation of federal criminal law]; *In re Three Children* (D.N.J. 1998) 24 F.Supp.2d 389, 392 ["the government's interest in investi-gating and successfully prosecuting crimes, which invariably includes taking the grand jury testimony of witnesses, far outweighs the incidental burden on the professed free exercise of religion in this matter."]; see also *Congregation B'Nai Jonah v. Kuriansky* (1991) 576 N.Y.S.2d 934, 936 [172 A.D.2d 35, 39] [state's interest in enforcing subpoenas for Medicaid fraud investigation outweighed infringement on free exercise "Unquestionably, the State has a profound interest in fighting corruption in the Medicaid industry and in enforcing its tax laws [citations]."].)

The Priests also argue that because the "documents pertain to confidential communications of a most private nature between a Roman Catholic bishop and the priests he ordained," their disclosure "will chill the free exercise of their religion, and inevitably and impermissibly alter the relationship [be-tween] Catholic bishops and priests and the way they practice their religion."

However, several jurisdictions have rejected similar arguments and we agree with their reasoning. (See *People v. Campobello* (2004) 348 Ill.App.3d 619 [810 N.E.2d 307, 311–312, 284 Ill.Dec. 654] [Catholic diocese must comply with government subpoena in sexual assault prosecution against priest, even if Canon 489 requires bishop to maintain secret archive for files relating to internal church discipline]; *Com. v. Stewart* (1997) 547 Pa. 277 [690 A.2d 195, 201–202] [criminal defendant's compelling interest in fair trial outweighed Catholic diocese's claim to withhold documents deemed confidential under canon law because "the burden on the Diocese's religious freedom furthers a compelling governmental interest by the least restrictive means available"]; *Society of Jesus of New England v. Commonwealth, supra,*

808 N.E.2d 272, 279 [state could subpoena personnel file of priest charged with sexual assault even if such disclosure would inhibit "communications that are necessary to maintain the Jesuits' relationship with one of its own priests"].)

Hence, we conclude that even if the pre-*Smith* compelling state interest test governs a California free exercise claim, that test is met here.

> f. *Conclusions regarding federal and state constitutional contentions.*

We are not persuaded by any of petitioners' freedom of religion arguments. We conclude disclosure of the subpoenaed documents is not barred by the First Amendment to the federal Constitution, or by the free exercise clause of California's Constitution. Having so determined, we next examine the two principal statutory grounds petitioners rely on to prevent disclosure of the subpoenaed documents to the grand jury, the clergy-penitent privilege and the psychotherapist-patient privilege.

> 2. *Documents in question do not satisfy criteria for application of clergy-penitent privilege, irrespective of the formation of clergy theory.*

 Evidence Code section 1032, within the article relating to the clergy-penitent privilege, defines a "penitential communication" as "a communication made in confidence, *in the presence of no third person* so far as the penitent is aware, to a member of the clergy who, in the course of the discipline or practice of the clergy member's church, denomination, or organization, is authorized or accustomed to hear those communications and, under the discipline or tenets of his or her church, denomination, or organization, *has a duty to keep those communications secret.*" (Italics added.)[11]

Petitioners argue the subpoenaed documents constitute privileged penitential communications within the meaning of Evidence Code section 1032 because they were generated in the course of the formation of clergy process during the Archdiocese's interventions to help troubled priests.

---

[11] The other clergy-penitent privilege statutes provide that: "a 'member of the clergy' means a priest, minister, religious practitioner, or similar functionary of a church or of a religious denomination or religious organization" (Evid. Code, § 1030); " 'penitent' means a person who has made a penitential communication to a member of the clergy" (Evid. Code, § 1031); "[s]ubject to [Evidence Code] Section 912, a penitent, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a penitential communication if he or she claims the privilege" (Evid. Code, § 1033); and, "[s]ubject to [Evidence Code] Section 912, a member of the clergy, whether or not a party, has a privilege to refuse to disclose a penitential communication if he or she claims the privilege" (Evid. Code, § 1034).

Petitioners' contention fails. The penitential communications are not privileged because they were not "made in confidence, in the presence of no third person so far as the penitent is aware," to a cleric who is obligated "to keep those communications secret." (Evid. Code, § 1032.)

### a. *Statutory scheme is controlling.*

 "Evidence Code section 911 provides, in relevant part: 'Except as otherwise provided by statute: [¶] . . . [¶] (b) No person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object, or other thing.' This section declares the California Legislature's determination that 'evidentiary privileges shall be available *only as defined by statute.* [Citation.] Courts may not add to the statutory privileges except as required by state or federal constitutional law [citations], nor may courts imply unwritten exceptions to existing statutory privileges. [Citations.]' (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 373 [20 Cal.Rptr.2d 330, 853 P.2d 496]; see *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656 [125 Cal.Rptr. 553, 542 P.2d 977] [privileges contained in Evidence Code are exclusive and courts are not free to create new privileges as matter of judicial policy unless constitutionally compelled] . . . ." (*American Airlines, Inc. v. Superior Court* (2003) 114 Cal.App.4th 881, 887 [8 Cal.Rptr.3d 146], italics added.)

"In section 911 of the Evidence Code, the Legislature clearly intended to abolish common law privileges and to keep the courts from creating new nonstatutory privileges as a matter of judicial policy. [Citations.] Thus, unless a privilege is expressly or impliedly based on statute, its existence may be found only if required by constitutional principles, state or federal." (*Welfare Rights Organization v. Crisan* (1983) 33 Cal.3d 766, 769 [190 Cal.Rptr. 919, 661 P.2d 1073].)

### b. *Parties' respective burdens of proof.*

Ordinarily, "[t]he party claiming [an evidentiary] privilege carries the burden of showing that the evidence which it seeks to suppress is within the terms of the statute." (*D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 729 [36 Cal.Rptr. 468, 388 P.2d 700]; see, e.g., *Department of Motor Vehicles v. Superior Court* (2002) 100 Cal.App.4th 363, 370 [122 Cal.Rptr.2d 504] [per *Chadbourne*, Department of Motor Vehicles bore burden of establishing claim of privilege based on Evid. Code, § 1040 (public entity has privilege to resist disclosure of official information)].)

Here, however, it was ultimately the District Attorney's burden to overcome the presumption of confidentiality.

Evidence Code section 917 provides at subdivision (a) "Whenever a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client, physician-patient, *psychotherapist-patient, clergy-penitent,* husband-wife, sexual assault victim-counselor, or domestic violence victim-counselor relationship, *the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential.*" (Italics added.)

■ Thus, in this context, the privilege-claimant "has the *initial burden* of proving the *preliminary facts* to show the privilege applies." (*Story v. Superior Court* (2003) 109 Cal.App.4th 1007, 1014 [135 Cal.Rptr.2d 532], italics added.)[12] "Once the claimant establishes the preliminary facts . . . , *the burden of proof shifts to the opponent of the privilege.* To obtain disclosure, the opponent must rebut the statutory presumption of confidentiality set forth in [Evidence Code] section 917[, subdivision (a).] . . . Alternatively, the opponent of the privilege may show that the privilege has been waived under [Evidence Code] section 912[13] . . . ." (*Story, supra,* at p. 1015, italics added.)

### c. *Standard of review.*

■ We review the trial court's privilege determination under the substantial evidence standard. " ' "When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it [citations]." ' " [Citation.] Accordingly, unless a claimed privilege appears as a matter of law from the undisputed facts, an appellate court may not overturn the trial

---

[12] Thus, for example, where the psychotherapist-patient privilege is claimed, " '[p]reliminary facts' means the existence of a psychotherapist-patient relationship, 'that is, that the person [the claimant] consulted was a " 'psychotherapist' " within the meaning of . . . section 1010, and [the claimant] was a " 'patient' " within the meaning of . . . section 1011.' [Citation.]" (*Story v. Superior Court, supra,* 109 Cal.App.4th at p. 1014.)

[13] Evidence Code section 912, subdivision (a), provides: "Except as otherwise provided in this section, the right of any person to claim a privilege provided by Section 954 (lawyer-client privilege), 980 (privilege for confidential marital communications), 994 (physician-patient privilege), 1014 (psychotherapist-patient privilege), 1033 (privilege of penitent), 1034 (privilege of clergyman), 1035.8 (sexual assault counselor-victim privilege), or 1037.5 (domestic violence counselor-victim privilege) is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege."

court's decision to reject that claim." (*HLC Properites, Limited v. Superior Court* (2005) 35 Cal.4th 54, 60 [24 Cal.Rptr.3d 199, 105 P.3d 560], fn. omitted.)

### d. *Development of California's clergy-penitent privilege.*

"The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return." (*Trammel v. United States* (1980) 445 U.S. 40, 51 [63 L.Ed.2d 186, 100 S.Ct. 906].) "The present day clergy-penitent privilege has its origin in the early Christian Church sacramental confession which existed before the Reformation in England. It has evolved over the years into the contemporary 'minister's' privilege adopted in some form in virtually every state of this country. (Yellin, *The History and Current Status of the Clergy-Penitent Privilege* (1983) 23 Santa Clara L.Rev. 95.)" (*People v. Edwards* (1988) 203 Cal.App.3d 1358, 1362–1363 [248 Cal.Rptr. 53].)

As noted, California's clergy-penitent privilege is contained in Evidence Code sections 1030–1034. Before these sections were enacted in 1965, the privilege was defined by Code of Civil Procedure section 1881, subdivision (3), which provided "A clergyman, priest or religious practitioner of an established church cannot, without the consent of the person making the *confession*, be examined as to any *confession* made to him in his professional character in the course of discipline enjoined by the church to which he belongs." (Italics added.) The current statute makes no reference to confessions, and instead provides an evidentiary privilege for " 'penitential communication.' " (Evid. Code, § 1032.)

### e. *For clergy-penitent privilege to attach, requirements of Evidence Code section 1032 must be satisfied.*

The central provision of California's clergy-penitent privilege is Evidence Code section 1032, which defines a penitential communication as a confidential communication made to a clergy person who is authorized to hear and obligated to keep secret such communications.

However, even with the privilege centered on a "communication," rather than on a "confession," not every statement made to a member of the clergy is privileged. "In order for a statement to be privileged, it must satisfy all of the conceptual requirements of a penitential communication: 1) *it must be intended to be in confidence*; 2) it must be made to a member of the clergy who in the course of his or her religious discipline or practice is authorized or accustomed to hear such communications; and 3) such member of the clergy

*has a duty under the discipline or tenets of the church, religious denomination or organization to keep such communications secret.* (§ 1032; 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 39.1, pp. 1405–1407.)" (*People v. Edwards, supra,* 203 Cal.App.3d at pp. 1362–1363, italics added.)

 f. *Petitioners' theory as to why clergy-penitent privilege is applicable.*

Mindful of the criteria of Evidence Code section 1032 requiring a communication to be made in confidence, in the presence of no third person, to a member of the clergy who is authorized to hear the communication and who, under the tenets of the church, has a duty to keep said communication secret, the petitioners invoke the Roman Catholic church's formation of clergy doctrine. They presented evidence, *post,* showing that pursuant to this religious doctrine, a bishop is charged with the obligation to care for the physical, spiritual, emotional and psychological well-being of the priests within his diocese. Further, the obligation imposed by this doctrine includes intervention with priests who are experiencing problems related to celibacy and sexuality, including an "intervention interview" with the accused priest. The evidence also showed the Archdiocese encouraged priests to discuss such problems with Cardinal Mahony and the Vicar for Clergy.

The Archdiocese argues the challenged subpoenaed documents fall within California's clergy-penitent privilege because they were confidential communications made in the course of troubled-priest interventions, and under the tenets of the church, Cardinal Mahony and the Vicar for Clergy were authorized to hear the communications and obligated to keep them secret. The Archdiocese also presented evidence the interventions with troubled priests depend on the troubled priests' understanding the communications will be held in confidence *within the church.*

 g. *Subject communications do not meet criteria of Evidence Code section 1032.*

Petitioners' theory conflicts with Evidence Code section 1032, which defines a "penitential communication" as "a communication made in confidence, *in the presence of no third person* so far as the penitent is aware," to a clergy person who must keep the communication secret. (Italics added.)

The record demonstrates the participants in the Archdiocese's troubled-priest interventions knew any communications likely were to be shared with

more than one person. According to the Archdiocese's declared policy, priests experiencing psychological and sexual problems were encouraged to discuss those problems with the archbishop and the Vicar for Clergy. Furthermore, the subpoenaed documents themselves amply demonstrate that communications to and from the individual priests were routinely shared by Cardinal Mahony, whoever happened to be the current Vicar for Clergy, and sometimes other Archdiocese employees as well.

 This sharing of information violates Evidence Code section 1032's requirement that the penitent's communication be "made in confidence, in the presence of no third person so far as the penitent is aware," to a cleric who is obligated "to keep those communications secret." The fact both parties to the original communication knew it likely would be transmitted to a third person vitiated *ab initio* any privilege under Evidence Code section 1032, or, alternatively, constituted a waiver of the privilege under Evidence Code section 912, subdivision (a).[14]

Here, the record demonstrates the District Attorney met the burden of rebutting Evidence Code section 917's presumption of confidentiality by proving the Priests were aware the communications were likely to be transmitted to third persons.

The Archdiocese argues these communications were not transmitted "to any third party, that is, someone outside of the bishop (or his alter ego, the Vicar for Clergy)." The contention is unavailing. We reject the argument that just because Cardinal Mahony considers the Vicar for Clergy his surrogate for dealing with troubled priests, there was no violation of Evidence Code section 1032's requirement that the communication be "made in confidence, in the presence of no third person so far as the penitent is aware, to a member of the clergy who . . . has a duty to keep those communications secret."

---

[14] Under Evidence Code section 912, subdivision (a), the clergy-penitent privilege is waived if a holder of the privilege discloses a significant part of the communication or consents to such disclosure.

Under Evidence Code section 912, subdivision (d), "A disclosure in confidence of a communication that is protected by a privilege provided by Section 954 (lawyer-client privilege), 994 (physician-patient privilege), 1014 (psychotherapist-patient privilege), 1035.8 (sexual assault counselor-victim privilege), or 1037.5 (domestic violence counselor-victim privilege), *when disclosure is reasonably necessary for the accomplishment of the purpose* for which the lawyer, physician, psychotherapist, sexual assault counselor, or domestic violence counselor was consulted, *is not a waiver of the privilege.*" (Italics added.) *Notably, the clergy-penitent relationship is missing from the enumerated relationships that benefit from this "reasonably necessary disclosure" rule.*

With respect to the various documents here in issue, discussed, *ante*, the referee held *none* was shielded by the clergy-penitent privilege. Guided by the principles set forth, *ante*, we uphold the referee's rulings in their entirety as follows.

Doe 1 No. 16–17: This is a letter from Cardinal Mahony to a priest. The referee reasonably could conclude the three numbered subparagraphs of this letter did not constitute penitential communications because they merely notified the priest of certain administrative decisions made by the Archdiocese. In any event, the entire letter is not covered by the clergy-penitent privilege because it was not sufficiently confidential. Not only did the priest know such communications were likely to be shared with the Vicar for Clergy, but the letter itself announced a copy was being sent to the Vicar.

Doe 1 No. 50–52: This document consists of a letter from a priest to the Vicar for Clergy, and a cover memorandum from the Vicar transmitting the priest's letter to Cardinal Mahony. The referee reasonably could conclude the letter was not within the clergy-penitent privilege because it merely discussed administrative actions taken by the Archdiocese, asked for legal information and suggested future job assignments. Furthermore, the letter was not sufficiently confidential to constitute a penitential communication because the priest knew it was likely to be shared with a third person. Further, the cover memorandum does not constitute a penitential communication because it does not contain any information transmitted to or from the priest.

Doe 1 No. 80: This is a memorandum from the Vicar for Clergy to Cardinal Mahony, reporting on a conversation with a priest. The referee reasonably could conclude this document did not constitute a penitential communication because it merely reported on the priest's cooperation with his therapists, strategized about possible legal problems and discussed church assignments. Moreover, the letter was not within the clergy-penitent privilege because it was not sufficiently confidential in that the parties to the communication knew it likely would be transmitted to a third person.

Doe 1 No. 397–400: This document consists of dated file notes containing summaries and verbatim excerpts from other subpoenaed documents:

The December 24, 1986, entry is a summary of Doe 1 No. 16–17, which we have concluded does not fall within the clergy-penitent privilege. The same result applies to this summary of that document.

The June 22, 1987, entry is a summary of Doe 1 No. 80, which we have concluded does not fall within the clergy-penitent privilege. The same result applies to this summary of that document.

Doe 2 No. 13: This is a letter to Cardinal Mahony's predecessor from an official of the Archdiocese then responsible for ministering to troubled priests. The referee reasonably could conclude this document did not constitute a penitential communication because it merely related an event in the priest's personal history.

Doe 2 No. 23: This is a memorandum to the file, written by the Vicar for Clergy, reporting on a third person's observation and evaluation of a priest's conduct in a particular situation. The referee reasonably could conclude this document did not constitute a penitential communication because it merely related an event in the priest's personal history.

Doe 2 No. 31–32: This is a memorandum from the Vicar for Clergy to Cardinal Mahony. The Archdiocese is only objecting to two paragraphs of this document. The third paragraph merely repeats communications, contained in Doe 2 No. 13 and Doe 2 No. 23, which we have concluded do not fall within the clergy-penitent privilege. The same result applies to this summary of those documents. The referee reasonably could conclude the information contained in the seventh paragraph of the memorandum did not constitute a penitential communication because it merely related an incident in the priest's personal history. In any event, the entire memorandum was not sufficiently confidential to constitute a penitential communication in that the parties to the communication knew it likely would be transmitted to a third person.

Doe 2 No. 34: This is a memorandum from a member of the Vicar for Clergy's staff to the Vicar for Clergy. A copy of the memorandum was transmitted to another member of the Vicar for Clergy's staff. The referee reasonably could conclude the document was not a penitential communication because it merely related incidents in the priest's personal history and offered an evaluation of the priest's situation. The document does not constitute a penitential communication because it does not contain any information transmitted to or from the priest. In any event, the memorandum was not sufficiently confidential to constitute a penitential communication in that the parties to the communication knew it likely would be transmitted to a third person.

Doe 2 No. 79: This is a letter from Cardinal Mahony to a priest, responding to a letter from the priest. A copy of Cardinal Mahony's letter was transmitted to the Vicar for Clergy. The letter was not sufficiently confidential to constitute a penitential communication in that the parties to the communication knew it likely would be transmitted to a third person.

Doe 2 No. 140: This is a memorandum from the Vicar for Clergy to Cardinal Mahony, advising him of a conversation a member of the Vicar's staff had with a priest and the priest's psychotherapist. The referee reasonably could conclude this document did not constitute a penitential communication because it was merely a status report concerning the priest's progress in psychotherapy. In any event, the document was not sufficiently confidential to constitute a penitential communication in that the parties to the communication knew it likely would be transmitted to a third person.

Doe 2 No. 172: This is a memorandum from the Vicar for Clergy to Cardinal Mahony, discussing the establishment of an aftercare program for when a priest completes psychotherapy. The document was not sufficiently confidential to constitute a penitential communication in that the parties to the communication knew it likely would be transmitted to a third person. The document does not constitute a penitential communication because it does not contain any information transmitted to or from the priest.

Doe 2 No. 183: This is a letter from the Vicar for Clergy to a priest. The referee reasonably could conclude the document did not constitute a penitential communication because it was largely taken up with administrative matters and any penitential aspect was insignificant. Moreover, the document was not sufficiently confidential to constitute a penitential communication in that the parties to the communication knew it likely would be transmitted to a third person.

Doe 2 No. 278: This document consists of excerpts from three of the documents discussed, *ante* (Doe 2 Nos. 140, 172 & 183), which we have concluded do not fall within the clergy-penitent privilege. The same result applies to these excerpts of those documents.

In sum, we conclude that none of the particular subpoenaed documents challenged by the Archdiocese falls within California's clergy-penitent privilege, and we affirm *all* of the referee's rulings in this regard.

> 3. *Application of psychotherapist-patient privilege to Archdiocese's claims regarding particular documents; the communication must be "reasonably necessary" to accomplish the purpose for which the psychotherapist was consulted.*

> a. *Controlling statute: Evidence Code section 1012.*

California's psychotherapist-patient privilege provides that a " 'confidential communication between patient and psychotherapist' means information, including information obtained by an examination of the patient, transmitted

between a patient and his psychotherapist in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation, *or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted,* and includes a diagnosis made and the advice given by the psychotherapist in the course of that relationship." (Evid. Code, § 1012, italics added.)[15]

> b. *Petitioners' theory why the psychotherapist-patient privilege is applicable to the disputed documents.*

Similar to their arguments for the application of the clergy-penitent privilege, petitioners assert that certain communications made in the context of the formation of clergy process are privileged pursuant to the psychotherapist-patient privilege.

Petitioners acknowledge the statutory language requiring that information communicated in psychotherapy not be disclosed to third persons other than those necessary to further the interests of the patient in the consultation. They argue that disclosures to third parties were duly made as reasonably necessary to accomplish the purpose of the psychotherapy, namely, diagnosis and treatment of issues relating to celibacy and sexuality, and therefore remain confidential within the meaning of Evidence Code section 1012.

> c. *Case law interpretation of Evidence Code section 1012; to remain privileged, disclosure to third persons must be in furtherance of the purpose for which the psychotherapist was consulted, namely, diagnosis and treatment of the patient.*

To reiterate, Evidence Code section 1012 defines a confidential communication between patient and psychotherapist as information transmitted between a patient and his or her psychotherapist in the course of that relationship, which information is disclosed "to no third persons other than those who are present to further the interest of the patient in the consultation, *or those to whom disclosure is reasonably necessary* for the transmission of the information or *the accomplishment of the purpose for which the psychotherapist is consulted,* and includes a diagnosis made and the advice given by the psychotherapist in the course of that relationship." (Italics added.)

---

[15] With respect to the parties' respective burdens of proof and the standard of review, the discussion in the previous section, relating to the clergy-penitent privilege, is equally applicable here.

The *purpose* for which a psychotherapist is consulted is set forth in Evidence Code section 1011, which defines "patient" as "a person who consults a psychotherapist or submits to an examination by a psychotherapist *for the purpose of securing a diagnosis or preventive, palliative, or curative treatment of his mental or emotional condition* or who submits to an examination of his mental or emotional condition for the purpose of scientific research on mental or emotional problems." (Italics added.)

There is ample case law illustrating disclosures to third persons which are "reasonably necessary" for the accomplishment of the *purpose* for which the psychotherapist was consulted. (Evid. Code, § 1012.)

In *Grosslight v. Superior Court* (1977) 72 Cal.App.3d 502 [140 Cal.Rptr. 278], the issue presented was whether the plaintiff in a personal injury action was entitled to discovery of a minor defendant's psychiatric hospital records, on the theory the records might contain statements made by the minor's parents to the hospital staff indicating the parents had knowledge of the minor's propensities for violence. (*Id.* at p. 504.)

*Grosslight* held such communications between parent and hospital were shielded by the psychotherapist-patient privilege because they were made "for the purpose of furthering the child's interest in communicating with the psychotherapist and . . . *to facilitate the diagnosis and treatment of the child.*" (*Grosslight v. Superior Court, supra,* 72 Cal.App. 3d at p. 506, italics added.) *Grosslight* reasoned "Although the [patient] at 16 or 17 is clearly old enough verbally to communicate with her doctors, the nature of her problem is psychiatric, and it is entirely possible that her psychiatric illness precludes objective, accurate and complete communication by her with hospital personnel without the cooperation of her parents." (*Id.* at p. 507.) Thus, any parental communication *to the hospital staff* in *Grosslight* would be privileged because it was made to assist in the diagnosis and treatment of the patient.

In *People v. Gomez* (1982) 134 Cal.App.3d 874 [185 Cal.Rptr. 155], the defendant contended that statements he made to students serving as interns with the family court services office were privileged. (*Id.* at p. 880.) *Gomez* rejected that argument, noting the psychotherapist-patient privilege extended to virtually every licensed classification of "therapist" but did not apply to student interns. (*Id.* at pp. 880–881; see Evid. Code, § 1010.)[16] *Gomez* went on to state, however, that under some circumstances, communications to student interns could be privileged if the students were working *"under the supervision of a licensee to whom the privilege does attach* [citation]." (*Id.* at p. 881, fn. 3, italics added.)

---

[16] Evidence Code section 1010 defines persons who are psychotherapists for purposes of the psychotherapist-patient privilege.

In *Luhdorff v. Superior Court* (1985) 166 Cal.App.3d 485 [212 Cal.Rptr. 516], the prosecution sought access to written records relating to conversations between a defendant and a clinical social worker, one Gramajo. (*Id.* at p. 487.) Gramajo was not a therapist to whom the privilege attached but "he worked under such a person generally, and [defendant's] case was ultimately *controlled and supervised by persons to whom the privilege attached.*" (*Id.* at p. 490, italics added.) *Luhdorff* was guided by "[t]he language of [Evidence Code] section 1012 [which] plainly indicates that communications made by patients to persons *reasonably necessary to assist psychiatrists and psychologists in the treatment of the patient's mental disorder* come within the privilege." (*Id.* at p. 489, italics added.) *Luhdorff* concluded "Gramajo clearly falls within the category of persons reasonably necessary for the transmission of information or the accomplishment of the purpose for which the psychotherapist is consulted." (*Id.* at p. 490.)

In *Farrell L. v. Superior Court* (1988) 203 Cal.App.3d 521 [250 Cal.Rptr. 25], the question presented was "whether communications made by a patient to other persons participating in a group therapy session [conducted by a counselor at a state hospital] come within the psychotherapist-patient privilege." (*Id.* at p. 527.)

*Farrell L.* reasoned "the other participants in a group therapy session are 'those who are present *to further the interest of the patient in the consultation . . . or the accomplishment of the purpose for which the psychotherapist is consulted . . . .*' (Evid. Code, § 1012.) The language of Evidence Code section 1012 plainly indicates that communications made by patients to persons who are present to further the interests of the patient come[] within the privilege. 'Group therapy' is designed to provide comfort and revelation to the patient who shares similar experiences and/or difficulties with other like persons within the group. The presence of each person is for the benefit of the others, including the witness/patient, and is designed to facilitate the patient's treatment. Communications such as these, when made in confidence, should not operate to destroy the privilege." (*Farrell L., supra,* 203 Cal.App.3d at p. 527, italics added.)

In *In re Pedro M.* (2000) 81 Cal.App.4th 550 [96 Cal.Rptr.2d 839], the juvenile court ordered a minor to "[c]ooperate in a plan for psychiatric, psychological testing or treatment." (*Id.* at p. 553.) The minor subsequently contended the juvenile court erroneously admitted the testimony of his therapist after he invoked the psychotherapist-patient privilege. (*Id.* at p. 554.) *Pedro M.* concluded said privilege did not preclude the therapist from testifying at the adjudication of the supplemental petition concerning the minor's participation and progress in the court-ordered treatment plan. (*Id.* at p. 555.)

*Pedro M.* explained "Evidence Code section 1012 itself permits the disclosure of a confidential communication between patient and psychotherapist to *'those to whom disclosure is reasonably necessary for . . . the accomplishment of the purpose for which the psychotherapist is consulted . . . .'* In our view, this would include the juvenile court, where the patient is a delinquent minor who has been properly directed to participate and cooperate in a sex offender treatment program in conjunction with a disposition order placing the minor on probation." (*In re Pedro M., supra,* 81 Cal.App.4th at p. 554, italics added.)

*In re Mark L.* (2001) 94 Cal.App.4th 573 [114 Cal.Rptr.2d 499] held "[t]he rationale of *In re Pedro M., supra,* 81 Cal.App.4th 550, is applicable in the juvenile dependency context, in which therapy has a dual purpose—treatment of the child to ameliorate the effects of abuse or neglect and the disclosure of information from which reasoned recommendations and decisions regarding the child's welfare can be made. As the Supreme Court has observed, '[w]ithout the testimony of psychologists, in many juvenile dependency and child custody cases superior courts and juvenile courts would have little or no evidence, and would be reduced to arbitrary decisions based upon the emotional response of the court.' (*In re Jasmon O.* (1994) 8 Cal.4th 398, 430 [33 Cal.Rptr.2d 85, 878 P.2d 1297].)" (*Id.* at p. 584.)

Most recently, in *In re Christopher M.* (2005) 127 Cal.App.4th 684 [26 Cal.Rptr.3d 61], the juvenile court placed the defendant on probation subject to numerous conditions, including conditions requiring that all records related to his medical and psychological treatment be made available upon request to the court and to the probation department. (*Id.* at pp. 687, 690.) Defendant contended said conditions of probation violated the psychotherapist-patient privilege. (*Id.* at p. 695.)

*Christopher M.* rejected the argument, explaining the express language of Evidence Code section 1012 "permits disclosure of otherwise privileged communications between patient and psychotherapist to third persons to whom disclosure is *reasonably necessary to accomplish the purpose* for which the psychotherapist is consulted." (*In re Christopher M., supra,* 127 Cal.App.4th at p. 696, italics added.) *Christopher M.* observed "Here, by reasonably limiting disclosure of otherwise privileged psychotherapist-patient communications to the probation officer and the court, the court acted under the authority of Evidence Code section 1012 and avoided unnecessary disclosure of those communications." (*Ibid.*)

 Additionally, we briefly look to case law relating to the physician-patient privilege, which is analogous to the psychotherapist-patient privilege.[17]

In *Rudnick v. Superior Court* (1974) 11 Cal.3d 924 [114 Cal.Rptr. 603, 523 P.2d 643], the plaintiff sued drug manufacturers for damages for injuries allegedly caused by a defective drug. (*Id.* at p. 927.) Defendants refused to produce their records containing adverse drug reaction reports on the ground that such reports constituted confidential communications by various physicians and that their production would be violative of the physician-patient privilege. (*Ibid.*)

*Rudnick* explained "The 'disclosure in confidence [by the physician] of a communication that is protected by [the] (physician-patient privilege) . . . *when such disclosure is reasonably necessary for the accomplishment of the purpose for which the . . . physician . . . was consulted,* is not a waiver of the privilege.' [Citation.] Thus, for example, if the physician reported to defendants the adverse effects of the drug on his patient so as to obtain assistance in the use of the drug in treating the patient, such disclosure even if consented to by the patient would not constitute a waiver of the privilege." (*Rudnick v. Superior Court, supra,* 11 Cal.4th at pp. 930–931, italics added.)

In *Blue Cross v. Superior Court* (1976) 61 Cal.App.3d 798 [132 Cal.Rptr. 635], the trial court entered a discovery order directing a prepaid health care plan to furnish plaintiff with information relating to other Blue Cross subscribers who had filed claims for psoriasis treatment. (*Id.* at pp. 799–800.) The reviewing court ordered issuance of a peremptory writ of mandate directing the trial court to vacate its discovery order. It explained "All parties agree that the patients' names and ailments were disclosed to Blue Cross for the purpose of paying the doctor's fees. Disclosure, then, was '*reasonably necessary for . . . the accomplishment of the purpose for which the physician [was] consulted*'; confidentiality was not lost and the privilege not waived." (*Id.* at pp. 801–802, italics added.)

Guided by these authorities, we review the trial court's determination as to the applicability of the psychotherapist-patient privilege to the challenged documents.

---

[17] Evidence Code section 992 provides: "As used in this article, 'confidential communication between patient and physician' means information, including information obtained by an examination of the patient, transmitted between a patient and his physician in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation or those to whom disclosure is *reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the physician is consulted,* and includes a diagnosis made and the advice given by the physician in the course of that relationship." (Italics added.)

d. *Application of Evidence Code section 1012 to Archdiocese's claims regarding particular documents.*

With respect to the various documents here in issue, discussed, *ante*, the referee held *none* was shielded by the psychotherapist-patient privilege. Pursuant to the principles set forth, *ante*, we uphold the referee's rulings, with one exception.

Doe 1 No. 50–52: This document consists of a letter from a priest to the Vicar for Clergy, and a cover memorandum from the Vicar transmitting the letter to Cardinal Mahony. The Archdiocese only claims that the cover memorandum, which recites a psychotherapist's recommendation about the priest taking a trip abroad, is protected by the psychotherapist-patient privilege. However, the referee reasonably could conclude the transmission of this information to the Archdiocese did not come within the "furtherance of the purpose" rule of Evidence Code section 1012, because any connection to furthering the priest's treatment was too attenuated. Moreover, neither party to this communication was a psychotherapist or someone being supervised by a treating psychotherapist.

Doe 1 No. 74: This is a memorandum to the file, by the Vicar for Clergy, reporting on treatment recommendations transmitted by a priest's psychotherapists. This communication does not fall within the "furtherance of the purpose" rule of Evidence Code section 1012 because the Vicar was not involved in rendering psychotherapy to the priest, nor was he being supervised by a treating psychotherapist.

Doe 1 No. 80: This is a memorandum from the Vicar for Clergy to Cardinal Mahony, reporting on a conversation the Vicar had with a priest regarding psychotherapy recommendations and future work assignments for the priest. This communication does not fall within the "furtherance of the purpose" rule of Evidence Code section 1012 because neither party to this communication was a psychotherapist or someone being supervised by a treating psychotherapist.

Doe 1 No. 397–400: This document consists of dated file notes containing summaries and verbatim excerpts from other subpoenaed documents:

The January 9, 1987, entry is essentially a copy of a psychotherapeutic report prepared by a priest's therapists. The report contains a detailed psychosexual history and diagnosis. This communication does not fall within the "furtherance of the purpose" rule of Evidence Code section 1012 because no person at the Archdiocese was involved in rendering psychotherapy to the priest, or was being supervised by a treating psychotherapist.

The June 22, 1987, entry is a summary of Doe 1 No. 80, which we have concluded must be produced to the grand jury. The same result applies to this summary of that document.

The September 6, 1996, entry is essentially a copy of a psychotherapeutic evaluation sent by a priest's therapists to a member of the Vicar for Clergy's staff. This evaluation contains both a diagnosis and treatment recommendations. This communication does not fall within the "furtherance of the purpose" rule of Evidence Code section 1012 because the Vicar for Clergy's staff was not involved in rendering psychotherapy to the priest, nor was that staff being supervised by a treating psychotherapist.

The March 5, 1999, entry is essentially a copy of a file note prepared by a member of the Vicar for Clergy's staff, reporting on a discussion he had with a priest. The document describes the priest's self-report concerning his level of functioning, his progress in therapy and his desires concerning future work assignments. This communication does not fall within the "furtherance of the purpose" rule of Evidence Code section 1012 because it does not convey any significant psychological information. Moreover, the Vicar for Clergy's staff was not involved in rendering psychotherapy to the priest, nor was it being supervised by a treating psychotherapist.

Doe 2 No. 46: This is the sole item as to which we overturn the referee's ruling because the "claimed privilege appears as a matter of law from the undisputed facts." (*HLC Properties, Limited v. Superior Court, supra,* 35 Cal.4th at p. 60.) This document is a memorandum from a member of the Vicar for Clergy's staff to a priest's psychotherapists. Said memorandum supplied the therapeutic team with information about a troubled priest's personal history as an aid to diagnosis and treatment. The record reflects such background information was routinely provided to assist the psychotherapists in diagnosing and treating the Priests. Under the reasoning of *Grosslight v. Superior Court, supra,* 72 Cal.App.3d at pages 506–507, we conclude this document is appropriately shielded by the psychotherapist-patient privilege because it was a disclosure reasonably necessary to accomplish the purpose for which the psychotherapist was consulted, namely, diagnosis and treatment of the patient. (Evid. Code, § 1012.) The inclusion of such material within the purview of the privilege "encourages full disclosure of pertinent matters that otherwise might be withheld by [third persons] to the detriment of the patient." (*Grosslight, supra,* 72 Cal.App.3d at p. 507.) Therefore, we overrule the referee's order that this particular document be produced.

Doe 2 No. 140: This is a memorandum from the Vicar for Clergy to Cardinal Mahony, advising him of a conversation a member of the Vicar's staff had with a priest and the priest's psychotherapist. Although the document is ostensibly a status report on the priest's progress in therapy, the referee reasonably could conclude it was not covered by the psychotherapist-patient privilege because it did not contain any significant psychological information. Moreover, this communication does not fall within the "furtherance of the purpose" rule of Evidence Code section 1012 because neither party to this communication was a psychotherapist or someone being supervised by a treating psychotherapist.

Doe 2 No. 172: This is a memorandum from the Vicar for Clergy to Cardinal Mahony, discussing possible aftercare programs for a priest when he completes psychotherapy. The referee reasonably could conclude it was not covered by the psychotherapist-patient privilege because it did not contain any significant psychological information. Moreover, this communication does not fall within the "furtherance of the purpose" rule of Evidence Code section 1012 because neither party to this communication was a psychotherapist or someone being supervised by a treating psychotherapist.

Doe 2 No. 278: This document consists of dated file notes containing excerpts from two of the documents discussed above. We have concluded that neither Doe 2 No. 140 nor Doe 2 No. 172 falls within the psychotherapist-patient privilege. The same result applies to these excerpts of those two documents.

In sum, we conclude that, *except for Doe 2 No. 46,* none of the particular subpoenaed documents challenged by the Archdiocese falls within California's psychotherapist-patient privilege, and we affirm all of the referee's rulings in this regard. We order that Doe 2 No. 46 not be turned over the grand jury.

4. *Attorney-client and attorney work product privileges are inapplicable.*

The Archdiocese contends some of the disputed documents should not be disclosed to the grand jury because they are protected either by the attorney-client privilege or by the attorney work product privilege. This claim is without merit.

Noting the referee concluded "the communications at issue [had] been made for multiple purposes," the Archdiocese argues that if any of the disputed documents were generated by "investigations of crime or communications to ascertain the validity of charges, as Respondent court asserts, then they should be protected by the Work Product Doctrine and/or the Lawyer-Client Privilege in addition to the First Amendment and Clergy Privilege."

However, the Archdiocese is confusing two different issues: (1) the referee's conclusion, in connection with his general ruling on the First Amendment and clergy-penitent privilege claims, that the Archdiocese had mixed motives for intervening with priests accused of sexual misconduct, and (2) the referee's rulings on the individual documents at issue in this writ proceeding. None of the remaining disputed documents falls within either the attorney-client or the attorney work product privileges.

Under Evidence Code section 952, the attorney-client privilege protects "information transmitted between a client and his or her lawyer in the course of that relationship . . . and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." " 'In California the [attorney-client] privilege has been held to encompass not only oral or written statements, but additionally actions, signs, or other means of communicating information. . . .' " (*Solin v. O'Melveny & Myers* (2001) 89 Cal.App.4th 451, 457 [107 Cal.Rptr.2d 456].) Under Code of Civil Procedure section 2018, subdivision (c), "[a]ny writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances."

The Archdiocese's attorney is referred to only twice in the 15 documents that remain in dispute. Doe 2 No. 31 refers to particular advice given by the attorney to the Vicar for Clergy, but this reference appears in one of the paragraphs of Doe 2 No. 31 that is *not* being disputed by the Archdiocese. In Doe 1 No. 50, the Vicar for Clergy refers to the attorney, but only to mention counsel's presence at a meeting during which Cardinal Mahony made a particular statement. There is no indication Cardinal Mahony's statement reflects any of the attorney's thought processes.

There is no indication any of the 15 disputed documents constitutes information transmitted between the Archdiocese and its lawyer.

Hence, none of the disputed documents falls within either the attorney-client or the attorney work product privilege.

*5. The* Stogner *decision does not invalidate the subpoenas.*

In 1993 the Legislature enacted Penal Code section 803, subdivision (g), in order to expand the statute of limitations in child molestation cases. *Stogner v. California, supra,* 539 U.S. 607, held this statute violated the ex post facto clause when used to revive prosecutions already time-barred before the statute was enacted. The Priests contend the grand jury subpoenas duces tecum violate the principles of *Stogner* because the subpoenas encompass documents that are irrelevant to crimes allegedly occurring after January 1988, and because, properly understood, *Stogner* prohibits prosecution of any child molestation crime committed before January 1, 1994.[18] These claims are without merit.

▆▆▆ The first claim fails because admissible 'other crimes' evidence is not restricted by the statute of limitations. (See Evid. Code, §§ 1101, subd. (b), & 1108.)[19] As the Priests themselves acknowledge, "neither Evidence Code section 1101(b) nor 1108 is a chargeable offense. They are merely rules of admissibility for evidence at trial."

▆▆▆ The second claim is unavailing because it misconstrues *Stogner,* which stated "[W]e agree that the State's interest in prosecuting child abuse cases is an important one. But there is also a predominating constitutional interest in forbidding the State to revive a long-forbidden prosecution. And *to hold that such a law is ex post facto does not prevent the State from extending time limits* for the prosecution of future offenses, or *for prosecutions not yet time barred.*" (*Stogner v. California, supra,* 539 U.S. 607 at p. 632, italics added.)

▆▆▆ Hence, the Priests' argument already has been firmly rejected by a number of courts which have recognized the difference between extension statutes and revival statutes. (See *People v. Terry* (2005) 127 Cal.App.4th 750, 775 [26 Cal.Rptr.3d 71] ["As *Stogner* indicates, extensions of existing,

---

[18] Penal Code section 803, subdivision (g), came into effect on January 1, 1994. The statute of limitations for child molestation cases is six years (Pen. Code, §§ 800, 805, subd. (a)).

[19] Under Evidence Code section 1101, subdivision (b), "evidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 401–402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible [by the rule excluding propensity evidence]."

unexpired limitations periods are not ex post facto because such extensions do not resurrect otherwise time barred prosecutions."]; accord *People v. Vasquez* (2004) 118 Cal.App.4th 501 [13 Cal.Rptr.3d 162]; *People v. Superior Court (German)* (2004) 116 Cal.App.4th 1192 [10 Cal.Rptr.3d 893]; *People v. Renderos* (2003) 114 Cal.App.4th 961 [8 Cal.Rptr.3d 163]; *People v. Robertson* (2003) 113 Cal.App.4th 389 [6 Cal.Rptr.3d 363].)

> 6. *No showing District Attorney impermissibly usurped grand jury authority.*

The Priests contend none of the subpoenaed documents may be disclosed because the District Attorney improperly usurped the grand jury's authority. This claim also is without merit.

The Priests assert the District Attorney openly declared he was using the grand jury to conduct "private" discovery for his own purposes that had nothing to do with any pending grand jury investigation, and that the referee improperly acquiesced in this manipulation of the grand jury process. We cannot agree.

This claim is based on a misreading of the District Attorney's oral argument to the referee and a misperception about the proper scope of a grand jury investigation, which " ' "is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning." ' " (*M. B. v. Superior Court, supra,* 103 Cal.App.4th at pp. 1394–1395.)

Contrary to the Priests' assertion the District Attorney was allowed to subvert the grand jury process, the record shows the referee rejected the District Attorney's argument he should be allowed to present, at the pre-indictment stage of a grand jury proceeding, evidence that would be inadmissible at trial.

The Priests complain that, although the District Attorney "may be present to advise the grand jury and conduct examination of witnesses for the grand jury, . . . he may not take the evidence he is exposed to in that capacity to use for other purposes outside the grand jury." But the Priests point to no evidence indicating such a thing happened here. They merely argue it can be *inferred* from the District Attorney's oral argument to the referee that the District Attorney *believed* he could do this. We do not agree with the Priests' interpretation of the District Attorney's comments. In any event, something more than bad thoughts would have to be demonstrated to sustain this claim.

7. *Subpoenas were not impermissibly vague.*

The Priests contend the subpoenas were defective because they were overbroad as to time, place and conduct, and imprecise in their description of the items to be produced. Again, these claims are without merit.

Although "[t]he Fourth Amendment requires search warrants to state with reasonable particularity what items are being targeted for search," in order to prevent police from rummaging through someone's belongings, a search warrant " 'need only be reasonably specific, rather than elaborately detailed, and the specificity required varies depending on the circumstances of the case and the type of items involved.' [Citation.]" (*U.S. v. Bridges* (9th Cir. 2003) 344 F.3d 1010, 1017.)

The subpoenas here requested "[a]ll documents and other materials that are in the possession, custody, or control of the Archdiocese of Los Angeles that relate in any way to allegations of child molestation or sexual abuse committed by Father . . . . [¶] The subpoenaed documents and other materials *include, but are not limited to*, documents in the Archdiocese general archives, general files, secret archives, secret files, . . . ." (Italics added.)

The Priests contend the subpoenas amounted to unconstitutional general warrants because their descriptions of the items to be produced were impermissibly vague. They argue that the "include, but are not limited to" language is precisely the kind of overbroad language found to have invalidated a search warrant in *U.S. v. Bridges, supra,* 344 F.3d 1010. But a crucial defect in *Bridges* was that the search warrant nowhere stated what criminal activity was being investigated. "In light of the expansive and open-ended language used in the search warrant to describe its purpose and scope, *we hold that this warrant's failure to specify what criminal activity was being investigated,* or suspected of having been perpetrated, *renders its legitimacy constitutionally defective.*" (*U.S. v. Bridges, supra,* 344 F.3d at p. 1016.) There is no such problem in this case.

The Priests contend the subpoenas were impermissibly overbroad as to time because they effectively asked for every personnel document since the Priests had been incardinated in the Archdiocese. As we pointed out, *ante,* however, the admissibility of other crimes evidence under Evidence Code sections 1101 and 1108 means relevant evidence could be discovered by such requests.

■ As to place, the Priests complain the subpoenas are not limited to crimes committed in Los Angeles County in compliance with Penal Code section 917, which provides "[t]he grand jury may inquire into all public offenses committed or triable within the county . . . ." However, as the District Attorney points out, Penal Code section 784.7, subdivision (a), allows a sex crime committed outside Los Angeles County to be joined with a Los Angeles County sex crime, and then for the entire case to be prosecuted in Los Angeles County.[20] (See *People v. Betts* (2005) 34 Cal.4th 1039, 1059 [23 Cal.Rptr.3d 138, 103 P.3d 883] [section 784.7 "expands venue for specified offenses to permit crimes . . . that occurred in different counties to be tried in the same county"].)

As to conduct, the Priests contend "The term 'sexual abuse' is so vague and broad that a reasonable Custodian of Records might feel obliged to produce information pertaining to sexual conduct that is not criminal at all, such as verbal sexual harassment, [or] consensual sexual activity with an adult—one person's bawdy joke may be another person's 'sexual abuse.' Indeed, in the context of the Catholic clergy . . . even masturbation and sexual thoughts may be deemed to be sinful and abusive." However, there is no indication whatsoever the subpoenas were read in such a broad manner. Had they been, objections could have been made.

Moreover, this claim is based on a reading of the phrase "evidence of child molestation and sexual abuse" in which the word "child" does not modify "sexual abuse." This is not the only, or even the most natural, interpretation.

### 8. *Several grand jury issues already have been decided in prior appellate proceeding.*

■ The Priests raise several grand jury issues that were decided in our earlier opinion in this matter. They claim the grand jury did not have the power to issue subpoenas duces tecum and, if it did, these subpoenas were defective because they were unaccompanied by a good faith affidavit. These issues were decided in *M. B. v. Superior Court, supra,* 103 Cal.App.4th 1384, and it is unnecessary to revisit them here.

---

[20] Penal Code section 784.7, subdivision (a), provides, in pertinent part: "When more than one violation of Section 220, except assault with intent to commit mayhem, 261, 262, 264.1, 269, 286, 288, 288a, 288.5, or 289 occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing, pursuant to Section 954, within the jurisdiction of the proposed trial."

*9. Priests' claims regarding particular documents are insufficiently presented and will not be addressed.*

■ The Priests contend some of the subpoenaed documents cannot be disclosed without violating the hearsay rule, the confidentiality of third persons named in the subpoenaed documents, the right of privacy, and the attorney-client, attorney work product, psychotherapist-patient, and clergy-penitent privileges. As to all of these claims, however, the Priests have failed entirely to specify which documents they are challenging. Their pleadings merely refer to "some of these records" and similarly vague characterizations.[21] This does not constitute adequate briefing. (Cf. *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 [31 Cal.Rptr.2d 264] ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived."].)

■ Nor have the Priests furnished this court with copies of any disputed documents. Hence, even assuming a privilege existed theoretically, we would be unable to determine that any particular subpoenaed document was in fact privileged. (See *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295–1296 [240 Cal.Rptr. 872, 743 P.2d 932] [failure to furnish adequate record on appeal mandates adverse ruling]; *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 [93 Cal.Rptr.2d 97] [failure to provide adequate record on appeal triggers adverse ruling because appealed judgments are presumed correct].)

■ "A defendant seeking review of a ruling of the trial court by means of a petition for extraordinary writ must provide the appellate court with a record sufficient to permit such review. [Citations.]" (*Sherwood v. Superior Court* (1979) 24 Cal.3d 183, 186 [154 Cal.Rptr. 917, 593 P.2d 862].) Because the Priests have failed to do so in this case, we decline to address their separate claims.

---

[21] For instance, regarding the psychotherapist-patient privilege, the Priests contend that "[w]*ithin some of the files* the Archdiocese intends to produce . . . are extremely private and intimate communications." (Italics added.) With regard to the clergy-penitent privilege, the Priests contend: "*Some of the items* within the command of the subpoenas include statements that are protected by this privilege . . . ." (Italics added.)

## DISPOSITION

The order to show cause is discharged. The Archdiocese's objection to Doe 2 No. 46 is sustained; this document will not be turned over to the grand jury. In all other respects, the petitions for writ of mandate, prohibition, or other appropriate relief are denied. All parties to bear their own costs in this proceeding. (Cal. Rules of Court, rule 56(*l*)(2).) The stay order is vacated.

Croskey, J., and Kitching, J., concurred.

Petitions for a rehearing were denied August 16, 2005, and the opinion was modified to read as printed above. The petitions of all petitioners for review by the Supreme Court were denied November 16, 2005.