Filed 7/3/13  P. v. Augustus CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D060939 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE 304177) |
| TREVOR BERNE AUGUSTUS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed.

Marianne Harguindeguy-Cox, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Steve Oetting and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury found Trevor Berne Augustus guilty of two counts of committing a lewd act upon a child under the age of 14 years (Pen. Code, § 288, subd. (a)). The trial court sentenced Augustus to five years in prison.

On appeal, Augustus claims that the trial court erred in admitting statements he made to a pastor and to a member of his church, in which he admitted that he had molested the victim. Augustus also claims that the prosecutor violated his constitutional rights under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and its progeny by failing to timely disclose a prosecution witness's prior misdemeanor conviction. Finally, Augustus claims that the trial court erred in admitting a recording of a police interview of the victim during which the victim disclosed the molestations.

We affirm the judgment.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The People's evidence*

In early 2010, Augustus lived with his wife, Michelle and their adopted children, 12-year-old M.B. and her brother. Augustus's mother, Barbara Augustus (Barbara), also lived on the property.

In the spring of 2010, Augustus took M.B. on a two-night camping trip. On the second night, while M.B. was in her sleeping bag in the tent, Augustus touched M.B.'s breasts and vagina, both over and under her clothing and bra. The touching lasted for

about 30 minutes. One weekend after the camping trip, at around 4:00 a.m., Augustus entered M.B.'s bedroom and touched her chest and vagina for about 10 minutes. Augustus also touched M.B.'s breast and vagina under and over her clothing on two other mornings when he entered her bedroom to wake her up.

On the afternoon following the last incident, M.B. told Michelle that Augustus had touched her chest area and "private," and that it made her feel uncomfortable. M.B. also told Barbara that Augustus had touched her that morning and gestured with her hand toward her vaginal area.

Barbara confronted Augustus, asking him, "[W]ere you feeling [M.B.] up?" Augustus sobbed and said, "[N]o—I guess [you] know—yeah." Augustus also admitted to Barbara that he had touched M.B. in the groin area during the camping trip. Barbara advised Augustus to seek spiritual guidance from a pastor.

On April 19, 2010, Augustus called Sean Speed, a member of, and volunteer at, the Bethel Assembly Christian Church in Alpine. Speed met with Augustus, who appeared distraught, remorseful, and a "little bit fearful." Augustus told Speed that he was a "child molester," that he had touched M.B. inappropriately when she was sleeping at night, and that he felt bad about it. Speed testified that Augustus told him that M.B. was becoming beautiful and that she was adopted.

The next day, April 20, Augustus called associate pastor Craig Osborne of the Bethel Christian Assembly Church and told Osborne that he wanted to meet with him. Osborne met with Augustus in Osborne's office at the church. Augustus told Osborne that Michelle and Barbara had confronted him about an incident with M.B. Augustus

3

also told Osborne that he had touched M.B. inappropriately on three occasions while she was in her room and Augustus thought she was sleeping. Augustus said that he enjoyed touching M.B. and that it excited him. Augustus also told Osborne that M.B. was getting older and more mature, and mentioned that she was adopted.

On April 21, Osborne reported Augustus's conduct to Child Protective Services. Detective Heather Czerwinski of the San Diego County Sheriff's Department subsequently interviewed Michelle, Barbara, Augustus and M.B. Barbara told Detective Czerwinski that M.B. had disclosed to her that Augustus had touched her vaginal area. M.B. told Detective Czerwinski about Augustus's molestation of her on the camping trip. M.B. also told the detective that Augustus had molested her on several occasions during the early morning hours in her bedroom. M.B. explained that during the molestations in her bedroom and on the camping trip, Augustus would touch her vagina and breasts.

B.    *The defense*

Augustus testified on his own behalf. Augustus said that he snuggled, cuddled and tickled M.B. on the camping trip, but denied having done anything sexual to her, and specifically denied touching her breasts and vagina. Augustus also testified that he would awaken M.B. in the morning for school by playing music and then nudging, shaking, pushing and poking her. If she was awake but not getting out of bed, he would tickle her neck, stomach and sides. Augustus maintained that he had never done anything sexual with M.B.

4

III.

DISCUSSION

A.  *The trial court did not err in admitting statements that Augustus made to Speed and Osborne*

Augustus claims that the trial court erred in admitting the statements he made to Speed and Osborne. Specifically, Augustus claims that the trial court violated his right to due process by determining the admissibility of his statements to Speed without holding an evidentiary hearing, and that the trial court erred in denying his motion in limine to exclude his statements to Osborne pursuant to the penitent-clergy privilege.

1.  *Factual and procedural background*

Prior to trial, defense counsel filed a motion in limine to exclude all statements that Augustus made to both Speed and Osborne. Augustus claimed that all of these statements were inadmissible pursuant to the penitent-clergy privilege. The prosecutor filed a trial brief in which she requested that the trial court deny Augustus's motion in limine in its entirety. The prosecutor argued that Augustus's statements to Speed were admissible because Speed is not a clergy member, and the penitent-clergy privilege therefore does not apply to communications between Augustus and Speed. The prosecutor contended that Augustus's statements to Osborne were not privileged because in order for the privilege to apply, the member of the clergy must have a duty, under the tenets of his church, to keep secret communications between a parishioner and a member of the clergy, and the tenets of Osborne's church do not mandate that disclosures such as Augustus's be kept secret.

5

During a pretrial hearing, the trial court discussed the in limine motion with counsel and stated, "Tentatively, it seemed like privileged conversations in both instances [i.e., with respect to Augustus's statements to Osborne and with respect to Augustus's statements to Speed]." However, the court stated that there was a question as to whether the tenets of Osborne's church mandated that disclosures such as those at issue in this case be kept secret. The court indicated that it would conduct an Evidence Code section 402 hearing[1] concerning the tenets of Osborne's church with respect to this issue, and that it would hold a separate hearing with respect to the statements made to Speed at a later date, if necessary.[2]

Later that day, the trial court held a section 402 hearing. At that hearing, the prosecutor asked Osborne, "And in your job description or in any tenet of the church as far as consulting with your main pastor, if someone were to disclose something like molesting or hurting a child, do you know, is there a policy in your church or a tenet in your church of what you do in that situation?" Osborne replied:

> "As pastors on staff, we're all under the same understanding
> of . . . being mandated reporters, so when we hear things like that
> when something is done to a minor, then we all understand that we

---

[1]     All further statutory references are to the Evidence Code unless otherwise specified.
        Section 402, subdivision (b) provides, "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

[2]     In her trial brief, the prosecutor noted that Speed and Osborne are members of the same church.

are legally bound to report that. When someone comes for counseling, there is a reasonable expectation of confidentiality that we won't turn and as we walk out the door tell somebody. But there is nothing stat[ing] I can't say anything or talk to anybody."

The prosecutor then asked, "So you don't say that to someone that speaks to you, "[W]hatever you tell me I'm not going to tell anybody?' " Osborne responded, "No, no, no."

On cross-examination, defense counsel asked, "At least there's a reasonable expectation that the things people come to tell you are told in a confidential nature, correct?" Osborne responded, "Yes, unless it's deemed illegal, broken [*sic*] a law concerning—specifically concerning a minor."

Osborne testified that after his conversation with Augustus, he talked with the senior pastor at his church and asked, " 'Hey, you know, what do I do with this information?' " Osborne explained that the senior pastor told him that "his understanding was I needed to report it."

At the conclusion of the hearing, the trial court ruled that all of the statements that Augustus made to Osborne were admissible. The court reasoned that "the tenets of this church require[d] the pastor . . . to disclose." The court also ruled that Augustus's statements to Speed were admissible, reasoning that Speed is not a priest or minister under section 1030.[3]

_____

3    Section 1030 provides, "As used in this article, a 'member of the clergy' means a priest, minister, religious practitioner, or similar functionary of a church or of a religious denomination or religious organization."

7

2.      *The trial court did not violate Augustus's right to due process in determining the admissibility of the statements that he made to Speed without holding an evidentiary hearing*

Without citation to any relevant authority, Augustus claims that the trial court violated his "federal due process rights"[4] in admitting the statements he made to Speed without first holding an evidentiary hearing.  We are not aware of any authority that supports Augustus's contention that due process requires such a hearing.  On the contrary, in *People v. Hoyos* (2007) 41 Cal.4th 872 (*Hoyos*), the California Supreme Court *rejected* a defendant's claim that a trial court violated his right to due process by determining the admissibility of his codefendant's (Alvarado) admissions to a jailhouse informant (Jimenez) without holding an evidentiary hearing:

> "Nor was the trial court required to hold an evidentiary hearing on federal due process grounds. . . .  [U]nder the federal due process clause, a defendant has a right to an evidentiary hearing on the issue of his confession's *voluntariness*.  [Citations.]  Although the Jimenez statements reported Alvarado's admissions, defense counsel never raised the issue of the *voluntariness* of Alvarado's admissions to Jimenez.  Rather, defense counsel claimed Jimenez's statements were *inherently unreliable* because Jimenez was a jailhouse

---

4       Augustus does cite to portions of section 402.  To the extent that Augustus claims that the trial court violated section 402, subdivision (b), we reject that argument, as well. "[S]ubdivision (b) of Evidence Code section 402 does not mandate . . . that a court must hold an evidentiary hearing on request.  Subdivision (b) states only that if a court holds an evidentiary hearing concerning the admissibility of a confession or admission, then it must do so outside the presence of the jury, if any party so requests." (*Hoyos, supra*, 41 Cal.4th at p. 897.)

It is undisputed that the trial court did *not* hold an evidentiary hearing concerning the admissibility of Augustus's statements to Speed in the presence of the jury, but rather, determined the admissibility of Speed's statements *outside* the presence of the jury. (See pt. III.A.1., *ante*.)  Thus, the trial court did not violate section 402, subdivision (b) in determining the admissibility of Augustus's statements to Speed.

informant. Therefore, the due process cases defendant cites are inapplicable." (*Id*. at p. 897.)

As in *Hoyos*, Augustus did not raise any claim in the trial court, and has not raised any claim in this court, that the statements he made to Speed were involuntary. Accordingly, we reject Augustus's claim that his right to federal due process required that the trial court hold an evidentiary hearing prior to determining the admissibility of his statements to Speed.[5]

3.      *The trial court did not err in admitting Augustus's statements to Osborne*

a.      *Governing law*

Sections 1030 through 1035 define the penitent-clergy privilege. Section 1033 provides in relevant part:

> "[A] penitent, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a penitential communication if he or she claims the privilege."

Sections 1031 and 1032 define "penitent" and "penitential communication" as follows:

> "As used in this article, 'penitent' means a person who has made a penitential communication to a member of the clergy." (§ 1031.)

> "As used in this article, 'penitential communication' means a communication made in confidence, in the presence of no third

---

[5]      In his reply brief, Augustus contends that the trial court's ruling with respect to the admissibility of his statements to Speed is not supported by substantial evidence. It is well settled that, " ' "points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before. . . ." ' [Citation.]" (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10.) Augustus fails to present any reason why he did not raise this contention in his opening brief. Accordingly, we decline to consider this claim.

9

person so far as the penitent is aware, to a member of the clergy who, in the course of the discipline or practice of the clergy member's church, denomination, or organization, is authorized or accustomed to hear those communications and, under the discipline or tenets of his or her church, denomination, or organization, has a duty to keep those communications secret." (§ 1032.)

In *Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417 (*Roman Catholic Archbishop*), the court summarized the requirements for a statement to qualify as privileged pursuant to the penitent-clergy privilege:

" 'In order for a statement to be privileged, it must satisfy all of the conceptual requirements of a penitential communication: 1) it must be intended to be in confidence; 2) it must be made to a member of the clergy who in the course of his or her religious discipline or practice is authorized or accustomed to hear such communications; and 3) such member of the clergy has a duty under the discipline or tenets of the church, religious denomination or organization to keep such communications secret. [Citations.]' [Citation.]" (*Id.* at pp. 443-444, italics omitted.)

"[I]n this context, the privilege-claimant 'has the initial burden of proving the preliminary facts to show the privilege applies.' [Citation.] 'Once the claimant establishes the preliminary facts . . . , the burden of proof shifts to the opponent of the privilege. . . . [Citation.]' [Citation.]" (*Roman Catholic Archbishop, supra*, 131 Cal.App.4th at p. 442, fn. and italics omitted.)

An appellate court reviews "the trial court's privilege determination under the substantial evidence standard. ' " 'When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial

evidence to support it [citations].' " [Citation.] Accordingly, unless a claimed privilege appears as a matter of law from the undisputed facts, an appellate court may not overturn the trial court's decision to reject that claim.' [Citation.]" (*Roman Catholic Archbishop*, *supra*, 131 Cal.App.4th at pp. 442-443.)

b. *Application*

In discussing the tenets of his church, Osborne testified that "there is nothing stat[ing] I can't say anything or talk to anybody," with respect to statements made by a parishioner during a church counseling session. Osborne also stated that he never tells individuals involved in such sessions that what they say during the sessions will be received in confidence. Further, while Osborne agreed with defense counsel that a person participating in a church counseling session would generally have a "reasonable expectation of confidentiality," Osborne clarified that this expectation would not apply if the person were to make statements about having engaged in illegal conduct, particularly if the illegal conduct involved a minor.

Osborne's testimony constitutes substantial evidence to support the trial court's ruling that the statements Augustus made to Osborne were admissible, since the tenets of Osborne's church do not include "a duty to keep those communications secret." (§ 1032.)

B. *The prosecutor did not violate Augustus's right to due process or his right to confront adverse witnesses by failing to disclose that Speed had previously suffered a misdemeanor conviction*

Augustus claims that the prosecutor violated his right to due process and his right to confront adverse witnesses by failing to disclose that Speed had previously suffered a misdemeanor conviction.

11

1.      *Factual and procedural background*

During the trial, after Speed testified, the prosecutor advised the court outside the presence of the jury that defense counsel had contacted her the previous evening concerning the possibility that Speed had suffered a prior "felony sexual conviction." The prosecutor stated that in response to counsel's inquiry, she instructed a paralegal in her office to "run the FBI raps," and that she learned that Speed had suffered a 2004 misdemeanor conviction in Utah for "criminal mischief." The prosecutor stated that Speed had been required to pay a $200 fine and that he had not been placed on probation.

The prosecutor informed the court and defense counsel that she asked Speed about the conviction. According to the prosecutor, in describing the circumstances of the facts underlying the conviction, Speed stated that he had been talking to someone who was refusing to listen to him. Speed said that he closed a door and told the person that the person was going to " 'hear him out.' " Speed told the prosecutor that in lieu of fighting charges related to his conduct, he paid a $200 fine. The prosecutor also stated that her office had contacted the district attorney's office in Utah, and that office had confirmed Speed's conviction. The prosecutor added that the Utah district attorney's office did not think that a police report had been prepared, and said that they had been unable to locate such a report.

The court responded, "It sounds like you did as much as you possibly could given the short notice." Defense counsel stated, "I'm satisfied it would not have [risen] to an impeachable area."

12

After defense counsel's closing argument, the prosecutor advised the court and defense counsel that she had just received a copy of a Utah police report concerning the incident giving rise to Speed's conviction. The report described an incident during which Speed had helped a woman who was having car trouble take her car to a garage for repairs. According to the report, after the woman refused Speed's request to have sex, Speed masturbated to the point of ejaculation in front of the woman in a closed room at the garage. The woman was afraid and felt that she could not leave. Speed was convicted of criminal mischief based on his conduct.

Defense counsel asserted that if she had known about Speed's conviction, she would have "want[ed] to have impeach[ed] him on that." The court and counsel proceeded to have extensive discussions concerning the circumstances of the prior conviction, Speed's testimony in this case, Speed's failure to accurately describe the prior conviction to the prosecutor, and the fact that the prosecutor had been unable to locate Speed for potential further proceedings. In the wake of these discussions, the court stated that it was contemplating holding a section 402 hearing with Speed for the purpose of learning more about the conviction. However, the court ultimately ruled, pursuant to section 352, that the court would limit any evidence pertaining to the conviction to a possible stipulation to be entered into between the parties. The court reasoned:

> "I'm going to deny it,[6] [section] 352. I find as I go
> through . . . probing this, it's going to be very difficult to limit both

6    The court's reference to "deny[ing] it," is apparently a reference to Augustus's request to be permitted to conduct additional cross-examination of Speed pertaining to the conviction.

13

sides to the matter at hand, whether or not he was convicted of a 2004 misdemeanor—of moral turpitude. . . .   And it has nothing to do with the timeliness of it.[7]  I'm willing to wait.  It's just that I'm fearful that we're going to end up in a circus based upon what has happened so far.  So I want to do the right thing, but it's obvious to me it's not going to be the right thing because we're going to go far afield and [put] Mr. Speed on trial, and I don't want to do that.

"So if you two want to huddle and talk about a stipulation that the Court would feel comfortable taking that I can say or I believe Mr. Speed would agree that this was the conduct he engaged in [in] 2004, I will accept that stipulation.  I will read it into the record . . . ."

The parties subsequently agreed to a stipulation pertaining to Speed's conviction and the court read the stipulation to the jury.  The stipulation provided:

" 'In 2004 Sean Speed suffered a conviction . . . out of the state of Utah for a Class B misdemeanor of criminal mischief—lewd conduct that is public masturbation.  This evidence is offered for the limited purpose of determining whether the witness had engaged in conduct that reflected on his . . . believability.' "

After reading the stipulation to the jury, the trial court permitted defense counsel to reopen her closing argument for the purpose of addressing the subject matter of the stipulation.  Defense counsel argued to the jury that Speed's suggestion that appellant was using the fact that his daughter was adopted as a justification for the molestation reflected Speed's "little, sick, twisted mind."  Defense counsel also argued that Speed was not credible in light of this prior conviction.

---

7    By discussing the "timeliness of it," the court was apparently referring to the fact that information about the events underlying Speed's conviction had not been discovered until closing arguments.

14

2.    *Governing law*

In *People v. Whalen* (2013) 56 Cal.4th 1, 64 (*Whalen*), the California Supreme Court summarized the following principles of law that govern a claim under *Brady, supra,* 373 U.S. 83 and its progeny:

> " 'The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused.  The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials.  [Citations.]  The obligation is not limited to evidence the prosecutor's office itself actually knows or possesses, but includes "evidence known to the others acting on the government's behalf in the case, including the police."  [Citation.]  [¶]  For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.  [Citations.]  *Evidence is material if there is a reasonable probability its disclosure would have altered the trial result.*  [Citation.]  Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies.  [Citations.]  Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review.  [Citation.]' [Citation.]"  (*Whalen*, *supra*, at p. 64, italics added.)

3.    *Application*

On appeal, Augustus argues that the prosecutor's failure to disclose information concerning Speed's conviction violated his right to due process under *Brady* as well as his right to confrontation.  Specifically, Augustus contends that if the prosecutor had timely disclosed the conviction, "It would have enabled [defense counsel] to properly cross-examine Speed as to the underlying facts of his conviction as well as the false information he gave to the prosecutor regarding it."  Augustus also argues, "Had the

15

evidence underlying Speed's conviction been introduced at trial, it would have rendered [Speed's] testimony biased and unconvincing."

As noted above, the trial court ruled that, pursuant to section 352, the sole evidence of Speed's prior conviction that the court would admit at trial would be a stipulation entered into between the parties concerning the circumstances of that conviction. *Augustus does not claim on appeal that the trial court erred in so ruling.* Augustus has not established that the prosecutor's failure to disclose Speed's conviction earlier in the proceedings was prejudicial, since, in light of the court's section 352 ruling, the trial court would not have admitted any additional evidence pertaining to that conviction in any event.

Further, even assuming that the trial court would have permitted the defense to offer additional evidence pertaining to the conviction if the prosecutor had disclosed the conviction at an earlier point in the proceedings, reversal still would not be required. Most fundamentally, even assuming that the jury would have entirely disregarded Speed's testimony in light of additional information concerning the 2004 misdemeanor conviction, Speed's testimony was far from the only evidence that Augustus committed the charged offenses. Among other evidence, the jury heard M.B.'s recorded statements to Detective Czerwinski that Augustus had molested her (see part III.C., *ante*), and M.B.'s grandmother's recorded statement to law enforcement officers that M.B. had indicated through gestures that Augustus had touched her vaginal area. The jury also heard the grandmother's recorded statement that Augustus admitted to her that he had touched M.B.'s groin area on the camping trip. Associate pastor Osborne also testified that

16

Augustus admitted to him that he had touched M.B. inappropriately on three occasions, and that the touching had excited Augustus. In light of this evidence, there is no " 'reasonable probability . . . disclosure [of the prior conviction] would have altered the trial result. [Citation.]' " (*Whalen*, *supra*, 56 Cal.4th at p. 64.)

Accordingly, we conclude that the prosecutor did not violate Augustus's constitutional rights by failing to disclose earlier in the proceedings that Speed had suffered a prior misdemeanor conviction.

C.      *The trial court did not abuse its discretion in admitting a recording of M.B.'s police interview in evidence*

Augustus contends that the trial court abused its discretion in admitting in evidence an audio recording of Detective Czerwinski's interview of M.B. Augustus claims that the trial court erred in failing to redact Detective Czerwinski's statements from the interview on the ground that her statements constitute hearsay. Augustus also claims that the trial court erred in concluding that statements that M.B. made during the interview were admissible as prior inconsistent statements. Finally, Augustus contends that the trial court erred in denying his motion to exclude the interview on the ground that its probative value was substantially outweighed by the risk of undue prejudice.

We apply the abuse of discretion standard of review to these claims. (See e.g., *People v. Williams* (1997) 16 Cal.4th 153, 197 ["On appeal, a trial court's decision to admit or not admit evidence . . . is reviewed only for abuse of discretion"].)

17

1.    *Factual and procedural background*

     a.    *Augustus's motion to exclude statements made by Detective Czerwinski during her interview of M.B.*

Prior to trial, Augustus filed a motion to exclude "superfluous statements by law enforcement officers during the interviews of witnesses." Augustus argued that the detectives had "interject[ed] personal feelings or opinions into the interviews . . . [and] interpret[ed] the meaning of other hearsay statements." As an example, Augustus noted that during Detective Czerwinski's interview with M.B., the detective stated, "[I]t takes a lot of guts to do what you did. And you know what? It's a good thing that you did because I'll tell you why. I've been doing this job a long time[.] If you didn't, it would have gotten worse." Augustus argued that these statements were irrelevant, constituted hearsay, and should be excluded pursuant to section 352.

In their trial brief, the People argued that the defense was attempting to "piecemeal [*sic*] the recordings and only introduce portions of them because [Augustus] is not in agreement with the mode of questioning of Detective[] Czerwinski . . . ." The People argued that "[t]he jury has the right to listen to each recording in its entirety and determine for themselves what weight and credibility to give each." The People further contended that "eliminating certain statements made by the detective may lead the jury to speculate as to what was said and [would] not be an accurate representation of the conversation."

During a pretrial hearing, the trial court ruled that the entire interview was admissible.

18

*Augustus's motion to exclude statements made by M.B. during her interview with Detective Czerwinski*

At trial, M.B. acknowledged that she told Detective Czerwinski both that Augustus had touched her breasts and vagina while the two were on a camping trip and that Augustus had engaged in similar conduct on approximately four other occasions in her bedroom at her house. However, M.B. testified that she now realized that Augustus had not molested her in fact, and said that she had been dreaming with respect to each incident that she had reported.[8]

After M.B. testified, Augustus filed a motion to exclude all of the statements that M.B. made during her interview with Detective Czerwinski on the ground that the statements were not inconsistent with her trial testimony.[9] In the same motion, the defense argued that M.B.'s interview statements should be excluded as cumulative because "the defense anticipates that multiple witnesses will testify as to the statements the victim made during pretrial interviews with social workers, therapists, and police." Augustus also argued that the statements should be excluded pursuant to section 352 because "the recording's probative value may be relevant in so much as it goes to

---

[8] During another portion of her testimony, when asked by the prosecutor whether Augustus had touched her "breast or vaginal area" during the camping trip, M.B. responded, "I do not think so." In addition, during another segment of M.B.'s testimony, the prosecutor asked, "Did your dad touch your breasts and vagina again while at home?" M.B. responded, "I do not remember."

[9] Augustus did not identify any specific statements that he sought to exclude, but rather stated, "Because the entire recording is not a single inconsistent statement[,] the consistent portions of the tape are inadmissible hearsay and should be excluded."

19

impeach the credibility of the victim, but its probative value is significantly diminished because there is no necessity of proving the issue by this particular piece of evidence."

At a hearing on Augustus's motion, defense counsel argued that none of the statements that M.B. made during her interview were admissible as inconsistent statements because, at trial, M.B. admitted having made the statements. The People argued that M.B.'s interview statements in which she provided details of the various molestations were admissible because they were inconsistent with her trial testimony, in which she claimed that she now realized that Augustus had not in fact molested her, and that she had only been dreaming.

The trial court denied the motion, and ruled that the People would be permitted to play the interview in its entirety. The court reasoned:

> "[T]he Court finds that this audiotape would be inconsistent in large part with the victim's testimony. And the Court is not going to order you to part and parcel statements and splice them up because then the Court's concern would be the potential error in taking statements out of context."

The court also ruled that the interview should not be excluded on the ground it was cumulative of other evidence, and that the probative value of the interview outweighed the possibility of prejudice stemming from its admission.

After the court ruled, the People played an audiotape of Detective Czerwinski's interview of M.B. During the interview, M.B. stated that Augustus had touched her vagina and her chest while the two were staying in a tent together on a camping trip. M.B. also said that Augustus had come into her bedroom while she was sleeping on approximately four occasions and touched her vagina and chest.

20

2.   *The trial court did not abuse its discretion in admitting statements that Detective Czerwinski made during the interview*

Augustus claims that the trial court erred in admitting Detective Czerwinski's statements in evidence on the ground that these statements constituted inadmissible hearsay.  In his brief, Augustus lists a series of statements that he contends "should have been redacted."  The statements include Detective Czerwinski telling M.B. that Augustus had been "honest" in a police interview and that it was a "good thing" that Augustus had "admitted it was his fault."  In addition, Augustus claims that questions such as, "Do you think [Augustus] should be arrested?" and "I mean do you think it's right what your dad did?" should have been redacted.  Augustus argues that the "audiotape as well as the transcript were out-of-court statements of the detective at the interview, introduced for their truth (i.e., to show the nature of appellant's fault for the underlying charges against him)."

a.   *Governing law*

"Hearsay evidence," defined as " 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is *offered to prove the truth of the matter stated*,' " is generally inadmissible.  (§ 1200, subd. (a), italics added.)  "Evidence of an out-of-court statement is . . . admissible if offered for a nonhearsay purpose—that is, for something other than the truth of the matter asserted—and the nonhearsay purpose is relevant to an issue in dispute.  [Citations.]  For example, an out-of-court statement is admissible if offered solely to give context to other admissible . . . statements."  (*People v. Davis* (2005) 36 Cal.4th 510, 535.)

21

b.     *Application*

While Augustus contends that Detective Czerwinski's statements were offered for their truth, he points to nothing in the record that would indicate that this is the case. Further, Augustus does not suggest that the trial court refused to instruct the jury that the detective's statements were not admissible for their truth.  Given that Detective Czerwinski was interviewing M.B., the trial court could reasonably have determined that the detective's statements were admissible for the nonhearsay purpose of providing context for M.B. statements.  (See *People v. Davis*, *supra*, 36 Cal.4th at p. 535; *People v. Riccardi* (2012) 54 Cal.4th 758, 801, fn. 21 ["Detective Purcell's statements were admitted for the nonhearsay purpose of giving context to Young's answers" given during police interview].)

Accordingly, we conclude that the trial court did not abuse its discretion in refusing to exclude statements that Detective Czerwinski made to M.B. during her police interview.[10]

3.     *The trial court did not abuse its discretion in admitting statements that M.B made to Detective Czerwinski as prior inconsistent statements*

Augustus claims that the trial court erred in admitting in evidence M.B.'s out-of-court statements to Detective Czerwinski as prior inconsistent statements.

---

[10]     In light of our conclusion, we need not consider the People's contention that Augustus partially forfeited his claim by failing to specify in the trial court all of the statements that he sought to exclude.

22

### a. *Governing law*

Section 1235, which pertains to inconsistent statements, provides, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."[11] In *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*), the Supreme Court summarized the admissibility of inconsistent statements pursuant to sections 1235 and 770:

> " 'A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770.' [Citation] 'The "fundamental requirement" of section 1235 is that the statement in fact be inconsistent with the witness's trial testimony.' [Citation.] ' "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness's prior statement. . . . " ' [Citation.]" (*Cowan, supra*, at p. 462, fn. omitted.)

### b. *Application*

M.B.'s trial testimony that Augustus had *not* molested her was plainly inconsistent with her statements to Detective Czerwinski that Augustus *had* molested her. Accordingly, we conclude that the trial court did not abuse its discretion in admitting statements that M.B. made to the detective as prior inconsistent statements.

---

11    Augustus does not dispute that the statements at issue were offered in compliance with section 770.

4.      *The trial court did not abuse its discretion in denying Augustus's request to exclude the recording of Detective Czerwinski's interview with M.B. pursuant to section 352*

Augustus claims that the trial court erred in denying his request to exclude the interview pursuant to section 352. Augustus claims that the statements that Detective Czerwinski made during the interview were irrelevant and that admission of the interview was cumulative in light of M.B.'s admissions at trial that she had previously told Detective Czerwinski that Augustus had molested her.

a.      *Governing law*

Section 352 provides:

> "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) The undue prejudice section 352 seeks to avoid " ' "is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' [Citation.] Painting a person faithfully is not, of itself, unfair." (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.) A trial court may exercise its discretion to exclude cumulative evidence, pursuant to section 352. (See *People v. Partida* (2005) 37 Cal.4th 428, 436, fn. 2.)

24

b.      *Application*

With respect to statements that Detective Czerwinski made during the interview, for the reasons discussed above, the trial court reasonably exercised its discretion to admit those statements in evidence for the purpose of giving context to M.B.'s interview statements.  As to the statements that M.B. made during the interview, while M.B. acknowledged at trial having made many of the statements, she also testified that she "tried" to tell Detective Czerwinski that the alleged molestations were just a dream, by saying "it was foggy."  M.B. also testified that she "didn't know how to" convey to Detective Czerwinski the idea that the molestations were a dream.  Under these circumstances, the probative value of the particular wording that M.B. used to disclose the molestations to Detective Czerwinski was extremely high.  Accordingly, we conclude that the trial court reasonably exercised its discretion in determining that the probative value of permitting the jury to hear the actual interview was not substantially outweighed by the prejudice stemming from the potentially cumulative nature of portions of the interview.

IV.

DISPOSITION

The judgment is affirmed.

_____
AARON, J.

WE CONCUR:


_____
NARES, Acting P. J.


_____
O'ROURKE, J.

26